# LOVE AND AMOS COAL COMPANY v. UNITED MINE WORKERS OF AMERICA.—378 S.W. (2d) 430.

Middle Section. July 26, 1963.

Certiorari Denied by Supreme Court December 5, 1963.

38

J. Clarence Evans, Nashville, John A. Rowntree, Knoxville, for plaintiff.

R. R. Kramer, E. H. Rayson, Knoxville, Harrison Combs, Washington, D. C., William Turnblazer, Middlesboro, Ky., for defendant.

I

SHRIVER, J. This is a suit for damages alleged to have resulted from the actions of the defendant, United Mine Workers of America, in inducing Osborne Mining Company to breach its contract with the plaintiff, Love and Amos Coal Company.

The case was tried before Judge Henry F. Todd, in the Third Circuit Court of Davidson County, without a jury and resulted in a judgment for $60,000.00 in favor of plaintiff in the first count of the declaration, and for treble damages under the Tennessee Statutes on the second count, in the total amount of $108,072.00, which awards were not cumulative but, under the decree, all payments in satisfaction of either of said amounts to be credited against the other.

From this judgment the defendant, United Mine Workers of America, hereinafter referred to as U.M.W., appealed and has assigned errors.

II

Assignments of Error

The four assignments of error present the questions to be decided on this appeal and will be discussed in the order presented.

The first assignment is that the Trial Court erred in failing to hold that the Federal Statutes, especially the National Labor Relations Act, as amended, pre-empt the field and scope covered by this action and, therefore, deprive the State Court of jurisdiction.

The second assignment is that there is no material and substantial evidence to support the judgment.

Under this assignment it is asserted that many of the acts complained of as inducing the breach of contract are not shown by the record to have resulted from the acts of agents or authorized representatives of the defendant union and that the alleged losses were remote and in consequence only of the contractual relationship with Osborne Mining Company, and that there is no material evidence that shows that U.M.W., in seeking to obtain a collective bargaining contract with Osborne Mining Company, intentionally harmed Love and Amos Coal Company.

The third assignment is that the Trial Court erred in awarding judgment in the amounts of $60,000.00 as compensatory damages on count one of the declaration.

There are three grounds asserted in the brief of counsel for the defendant as supporting this third assignment which will be discussed hereinafter.

The fourth assignment is that the Court erred in awarding $36,024.00 as damages under count two of the declaration and in trebling this amount under the Tennessee Treble Damage Statute, Section 47-1706, T.C.A. It is asserted that the Treble Damage Statute is not applicable in this case because the contract in question was in parol and called for execution over a two year period and, therefore, was unenforceable under the Statute of Frauds, and that unlawfully inducing the breach of an unenforceable contract will not support an award of damages under the Treble Damage Statute.

It is further argued that the foregoing Statute is not applicable inasmuch as the damages claimed resulted only indirectly from the defendant's alleged misconduct and is not shown to have been a result intended by the U.M.W.

## III

## The Facts

Love and Amos Coal Company, is a Tennessee corporation with its principal office and place of business at Nashville, Tennessee, and whose business is the operation of a coal sales agency. It is not a mine operator or coal producer.

The defendant, United Mine Workers of America, is an unincorporated labor organization with many members throughout the United States. It functions under a written constitution and maintains its headquarters in Washington, D.C.

The Osborne Mining Company is a Kentucky corporation engaged in the mining of coal at various places in Southeastern Kentucky and Northern Tennessee.

John Amos, at the time of the incidents here involved, was president of the Love and Amos Coal Company and also an officer of Osborne Mining Company and very active in directing its operations.

In the early 1950's TVA was engaged in a substantial expansion of its coal burning operation notably at the Kingston, Tennessee plant. Mr. Amos, having in mind a contract to supply coal to this plant, sought a supply near the Southern Railway in Northeast Tennessee so as to take advantage of the favorable freight rates to

the Kingston plant. Thus, large tracts known as the Packard Lease and the Gatliff Lease located near Jellico, were acquired in 1953 or early 1954 covering some twenty-five acres of coal lands.

In 1954 plaintiff entered into an oral contract with the Osborne Mining Company under which this company was to mine coal on the above lands located near Jellico, Tennessee. Under this agreement to sell the coal so mined by Osborne plaintiff was to receive a commission of 25¢ per ton for such coal sold by it.

In anticipation of fulfilling the contract subsequently entered into with TVA by Love and Amos, plaintiff supplied funds to Osborne Mining Company for purchase of more and larger machinery and as working capital.

In June, 1954, the plaintiff, Love and Amos Coal Company, obtained a contract for the sale of 500,000 tons of coal to the Tennessee Valley Authority, the same to be mined from the lands on which the Osborne Mining Company was operating. Delivery of this coal was to be made within a period of two years from the date of the TVA contract.

In early July, 1954, Osborne began delivering coal to TVA under this contract, part of such coal being mined by it in strip mines located on its leased premises and part of it by its subleases who were operating small underground mines on the same premises. The coal that was delivered on this contract was hauled to the railroad, a distance of several miles, by truckers who were independent contractors, and by these truckers unloaded into tipples located on the railroad and from which tipples it was placed in railroad cars for delivery to the point of destination.

Osborne Mining Company demonstrated its ability to expand and produce greatly increased tonnage in the period prior to 1954 and this tonnage expanded from one or two cars a week in 1950 to approximately a quarter of a million tons in 1954. It was the understanding between these parties that production would be built up to 13,000 tons a week on the Packard and Gatliff leases and the record shows that it was reasonably estimated that there were many millions of tons of recoverable coal on these properties.

After entering into a contract with TVA for shipment of coal from these leases, with the coal to be loaded on the Southern Railway at Jellico, the price to be f. o. b. at the loading point, production was commenced under the contract with TVA dated June 4, 1954. The contract was executed by Love and Amos in written form and was accepted by Osborne Mining Company which started out to fulfill its agreement. Osborne shipped substantial volumes of coal for a period of some twenty-one months with Love and Amos receiving a commission of twenty-five cents a ton under this agreement.

It is also shown that in entering on the Packard and Gatliff leases, Osborne Mining Company had an additional understanding with Love and Amos that the TVA contract would be used as a backlog of production as it was built up but that other contracts might be made for supplying other coal purchasers from these properties.

Osborne Mining Company also engaged a number of underground operators to open small mines on these properties so as to obtain additional supplies of coal.

As is argued by counsel for the plaintiffs, in the absence of interference by the defendant and its members there

is nothing in the record to indicate that Osborne Mining Company would have had any difficulty in meeting the requirements of the TVA contract by its production from these leases. In fact it appears that it would probably have increased production considerably above the level required by the TVA contract.

It is pointed out that the events shown in the proof in the present case involve the territory and personnel of District 19 of United Mine Workers of America, a nonself-supporting district, with officers appointed and paid by the International and that it operates with funds from the International organization of Mine Workers.

Late in July 1954 Osborne Mining Company had some labor troubles and it is asserted by counsel for the plaintiff that the campaign of U.M.W. to drive the local brokers and producers from the TVA coal market began at this time.

Exhibit 49 is an editorial in the United Mine Workers Journal for July 1, 1954 which attacks severely the TVA policy of buying coal from non-union sources and from ''get-rich-quick brokers'', and refers to the first attack on this policy in the Journal for June 1, 1954.

Exhibit 12 is United Mine Workers Journal of February 15, 1955. It indicates an effort on the part of U.M.W. to induce TVA to require U.M.W. contract terms of all their coal suppliers.

It is argued by counsel for plaintiff that the purpose of U.M.W. was to stop the flow of non-union coal, at whatever cost and means necessary, and that this purpose is illustrated by many of their publications and actions. For example H. B. Wicks, a member of U.M.W.

at the time in question, testified about a U.M.W. meeting in Jellico at which Albert Pass, Secy.-Treas. and acting President of District 19, spoke to the gathering. Wicks testified:

"Albert Pass said that there was coal being loaded there in Jellico without any royalty being paid on it, he wanted it stopped, regardless of what it took to stop it. All we had to do if we got into anything was look back and he'd be behind us."

There appeared in the Journal of U.M.W. the names of the coal brokers who had secured contracts with TVA with the tonnage, the price and the place of shipment given. The Love and Amos contract was the largest on the published list and the article in the Journal stated, "TVA's irresponsible policy of awarding contracts to brokers and non-union operators is under widespread investigation. . . ."

It appears that soon after the publication of this article in the Journal a large number of men descended on the Southern Railway tipple in Jellico where the coal was being loaded under the Love and Amos contract.

The record indicates that placards and signs carried by U.M.W. pickets advised the public that they had a dispute with Love and Amos Coal Company as well as with Osborne Mining Company and some of the witnesses expressly so testified. (Tr. 997, 998, 501)

Thus, there appeared at Jellico on July 23, 1954 a large and threatening group of from 50 to 100 men took over the premises of the loading tipple and the railroad yards. This group of men blocked the path of one of the loaded coal trucks that had come to unload, the door was jerked

open, and threats made to the driver. Other trucks that came to the tipple to unload could not get access to it because of the menacing attitude of the group of men and among those present on this occasion were Taylor Maddox and Ed Daniel, two of the U.M.W. organizers. When Mr. Clifford Osborne requested Maddox to let the trucks dump their coal he stated "No you will never dump them", and indicated that Osborne would have to sign a Union Contract before the coal could be loaded on the railroad cars.

On July 24, an injunction was obtained against the riotous activities of these men and coal was delivered for a time.

The record is replete with instances that occurred after this such as bullets being fired into a truck that was hauling from the mine into Jellico. In early April 1955 the U.M.W. had a mass meeting in Jellico at which the Acting President of District 19, Albert Pass, along with organizers Daniel and Maddox, addressed the men. Pass is quoted as having told the men to stop the non-union coal that was being shipped out of Jellico regardless of the cost, as hereinabove noted.

On April 6, 1955, the Southern Railway yards in Jellico were overrun by a crowd of several hundred men at which time truck drivers were beaten, trucks loaded with coal that had come in for unloading at the tipples were dumped about the town and, on the same day, this crowd gathered in a long caravan of vehicles and went to the nearby community of Newcomb, where they beat up the operators of the Boots and Cox mine, which mine remained closed until it signed a U.M.W. contract. There were beatings at the Frost mine when M. Frost was

knocked unconscious and, thereafter, abandoned his operation.

On April 11, 1955, a large crowd of men, some of whom were identified as U.M.W. members, proceeded to the Van Huss mine South of Jellico, where Van Huss was severely beaten and, at the trial in a suit brought by Van Huss against these men, it appears that the defendants were represented by attorneys paid by District 19, of U.M.W.

Two days later a large crowd assembled and went to the Osborne mine on the Packard lease but Mr. Osborne saw them coming and warned his men who abandoned the operation at the time. Roofing nails were strewn along the route that the trucks had to travel in hauling coal causing an abnormal amount of tire trouble and such activities continued over a long period of time.

On the night of July 14, 1955, the night crew operating on the Packard property in an isolated, wooded, mountain hollow were fired on from the hillside so that they were compelled to turn off their lights and flee for shelter. Afterwards more than a hundred empty cartridge cases were found on the mountain-side. Fortunately only one man was struck before he reached cover. Naturally the operators of these shovels were afraid and declined to continue the operation thereafter.

The witness Stott testified that on a visit to District 19's office in Middlesboro the acting president of the District, Albert Pass, asked him for assistance in getting a list of Osborne's employees and then bragged to him that they had stopped Osborne at Jellico and were going to stop Osborne at Gatliff.

The testimony regarding instances of interference and intimidation is voluminous but we do not deem it necessary to go into any further detail concerning it. Suffice it to say that the result of the foregoing activities was that most of the employees of Osborne Mining Company quit because of fear.

Due to the loss of employees, and the inability of Osborne Mining Company to produce coal, Love and Amos was forced to cancel the TVA contract by letter of September 3, 1955, the cancellation to take effect six months after the notice, in accordance with the terms of the contract.

■ We agree with the conclusions reached by the Trial Judge that there is sufficient evidence in the record to show that the activities complained of were instituted and carried on by and through the defendant United Mine Workers of America in an effort to unionize these mines, and that there is also sufficient evidence to show that the result obtained was not merely an indirect result but was a part of the plan and purpose of the defendant to close down the operation of Osborne Mining Company unless it agreed to a unionization of its workers and that one of the targets aimed at in these demonstrations by the defendant was the Love and Amos contract with TVA which it desired to see cancelled.

Judge Henry Todd in deciding this case discussed the amount of the damages awarded as follows:

"Now Gentlemen, here is what we have:

"We have what appears to be a proven productivity of the Osborne operation of 13,500 tons per month, multiplied by twenty-four, resulting in 342,000 tons of

proven productivity during the period of the TVA contract, less 173,903.5 tons actually delivered, leaves 150,096.5 additional tons that might reasonably have been expected to be produced and delivered for the benefit of the Plaintiff during the period of the TVA contract, multiplied by 25¢ per ton, equals $37,542.12, but I don't think anybody contends for that, because I have been dropping a few decimals here and there. Under the testimony of Mr. Stone, had the entire TVA contract been performed, that is, had the deficiency of 365,000 tons actually been delivered, there would have been an additional expense of $150 per month, or $3600 for the twenty-four months.

"Relating that to the shortage of 150,000 tons, then it's reasonable to assume that the extra expense of delivering that 150,000 tons, or rather handling it, would have been $1500. Subtracting that from $37,524 leaves net damages as a result of the termination or non-performance of the TVA contract of $36,024.

"Now, Gentlemen, in respect to Count Number I, the plaintiff is entitled to some consideration for the reasonable anticipation of the continuance of its arrangement with the Osborne Company. There has been considerable proof introduced on the subject. There are many imponderables involved in that. There is, of course, proof that at least one contract for 75,000 tons was declined, was available and declined, on which profit at 25¢ a ton would have been $18,750, if it had been carried out, and what I refer to is gross profit and not net profit on the transaction.

"Gentlemen, I have found actual special damages in the amount of $36,024. On Count Number I, I will

allow total compensatory damages of $60,000. On Count Number II, the allowance will be restricted to the actual special damages under the contract, $36,024 times three.''

\* \* \* \* \* \*

''The recovery allowed on Count I is concurrent with the recovery allowed on Count II, not cumulative, so it would simply be $36,024 times three, $108,072.

''I did that for this reason, Gentlemen, that actually it is in the nature of special verdict, hopefully that if the Appellate Court should decide that the statutory action does not apply but the common law action does, it might be that we could save re-trying the case.''

## IV

### Conclusions of Law

Appellant's first assignment of error is that the trial Court erred in failing to hold that, under the National Labor Relations Act as amended, jurisdiction is in the Federal Courts and that the State Courts have no jurisdiction. They cite San Diego Building Trades Council, Millmen's Union, Local 2020 v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.(2d) 775, as authority.

It is to be noted that in the prior Love and Amos case growing out of the same facts as those shown here, and which case went up from the Federal Court at Knoxville, the U.S. Court of Appeals, 6th Circuit, in 279 F.(2d) 716, among other things, stated:

''If Love & Amos were damaged as a result of any activities of defendants directed at it, an adequate remedy exists under state law.''

It is pointed out that Federal Labor Laws contain only one section which gives Federal Courts jurisdiction to award damages in a labor dispute, and that is the section on secondary boycott, 29 U.S.C.A. sec. 187(b).

Even where a party has the right to recover back pay or other damage under the Federal Labor Law, he may still have a right to recover in the State Courts under the rule announced by the U. S. Supreme Court in International Union, United Automobile Aircraft and Agricultural Implement Workers of America (UAW-CIO) v. Russell, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.(2d) 1030. There are a number of cases wherein the U. S. Supreme Court has recognized preservation of a right of action under state laws where the injury arises from acts of violence. In this kind of case, at least, there is some recognition by the U. S. Supreme Court that it is essential to preserve the police power of the states to insure that local authorities will be able to protect the rights of life, liberty and property. International Union, United Automobile, Aircraft and Agricultural Implement Workers of America (UAW-CIO) v. Russell, supra, United Construction Workers v. Laburnum Corporation, 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 and San Diego Building Trades Council, Millmen's Union, Local 2020 v. Garmon, supra.

We are satisfied that the State Courts have jurisdiction of this cause, therefore, assignment No. 1, is overruled.

Assignment No. 2, is that there is no material and substantial evidence to support the judgment awarded by the Trial Court.

. As stated hereinabove, we think there is sufficient evidence to show that U.M.W. is responsible for the activities complained of as was found by the Federal Court and announced in United Mine Workers of America v. Osborne Mining Company, 279 F.(2d) 716, where it was said:

"We think the evidence supports the Findings and Conclusions of the District Judge that the defendants were responsible under the common law doctrine of respondeat superior for the acts of their agents and servants. United Construction Workers etc. v. Laburnum Construction Corp., 1954, 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025; United Mine Workers of America v. Meadow Creek Coal Co., supra [6 Cir., 1959, 263 F.(2d) 52]; Lewis v. Benedict Coal Corp., 6 Cir., 1958, 259 F.(2d) 346, 352; Brumley v. Chattanooga Speedway & Motordrome Co., 1917, 138 Tenn. 534, 198 S.W. 775."

Assignment No. 2 is overruled.

The third assignment is to the effect that the Trial Court erred in awarding judgment in the amount of $60,000.00 as compensatory damages on count one of the declaration. This is supported by argument concerning the way in which the Court arrived at these figures. In calculating the loss of commissions by Love and Amos with respect to the TVA contract, it is argued that the trial Court having found that after the interference started, Osborne's productive capacity was not sufficient to fulfill the TVA contract, it was error to allow any damages on the Navy and Georgia Power Co. contracts, and especially that it was error not to deduct from the TVA contract the amount of commissions received by

Love and Amos and Bradford Fuel Company on the Georgia Power Co. and Navy contracts.

■ It is shown that Love and Amos had an agreement with Osborne Mining Company that it would sell the coal produced by that company and it, in turn, agreed to supply coal and allow a commission of 25¢ a ton without any designation of time as to the duration of the agreement and that each contract procured later on was subject to examination and acceptance by Osborne Mining Company. These later contracts with Georgia Power and the Navy were accepted by it and we fail to see where there was any error in allowing the loss.

■ Under the common law rule with respect to interference with a contract a cause of action lies for such interference even though the contract is terminable at the will of the parties. Dukes v. Local Union No. 437, 191 Tenn. 495, 235 S.W.(2d) 7, 26 A.L.R.(2d) 1223, 30 Am.Jur. p. 75, Interference, Sec. 26.

It is further pointed out that all of the Osborne Coal which Love and Amos could ship from Jellico did go to TVA. It was only the coal shipped from Gatliff that went to others and this was after TVA refused to share in the additional cost of freight from Gatliff as against Jellico.

On the whole, we are satisfied with the conclusions reached by the trial Judge with respect to the amounts awarded by him and, therefore, assignment No. 3 is overruled.

■ Assignment No. 4 is that the trial Judge erred in awarding $36,024.00 damages under count 2 of the declaration and in trebling this amount under the Treble Damage Statute.

It is argued that the Tennessee Treble Damage Statute is not applicable in this case because the contract between Love and Amos and Osborne Mining Company was not to be fulfilled within a year and that, being an oral contract, it was unenforceable under the Statute of Frauds T.C.A. sec. 23-201.

It is pointed out by counsel for plaintiffs that this is not a situation where one of the parties to the contract, or one standing in the place of such party, has repudiated the contract or has invoked the Statute of Frauds. To the contrary, representatives of both Love and Amos and Osborne Mining Company reaffirmed the contract and continued their efforts to comply with it.

The appellant's argument hangs on the authority of Evans v. Mayberry, 198 Tenn. 187, 278 S.W.(2d) 691, 279 S.W.(2d) 705, for the proposition that, before there can be a recovery for procuring a breach, the contract must be enforceable under the Statute of Frauds. The Evans case and Watts v. Warner, 151 Tenn. 421, 269 S.W. 913, cited therein with approval, both differ from the present case in that, in each of those cases, one of the parties had actually repudiated the contract which fact was emphasized by the Court.

In the Watts case the Court said:

"No judgment could be based against a defendant for interference with an unenforceable repudiated contract. Certainly after repudiation there were no legal rights under such a contract which could be infringed."

This language was reiterated in the later case of Evans v. Mayberry.

We think that the rule stated in Evans v. Mayberry and Watts v. Warner should not be extended beyond the facts of those cases so as to embrace a case like the one at bar.

■ Defendant did not plead the Statute of Frauds and there is substantial authority in this State to the effect that if the Statute is to be relied on as a defense it must be specially pleaded. Citty v. Manufacturing Company, 93 Tenn. 276, 24 S.W. 121; Barnes Bros. v. Coal Co., 101 Tenn. 354, 47 S.W. 498; Gibson County Bank v. Shatz, 12 Tenn.App. 281. 49 Am.Jur., Statute of Frauds, No. 602, where it is said that there are many and good reasons for this rule.

While this seems to be conclusive of the matter, we will notice the other arguments made on this question.

Plaintiff's counsel argue that there are sufficient papers in the record to constitute a compliance with the Statute if it is to be invoked. They cite Cobble v. Langford, 190 Tenn. 385, 230 S.W.(2d) 194, where it was said that any number of papers may be connected together to make out a memorandum of sale of realty, sufficient to satisfy the requirement of the Statute of Frauds, and the time of the execution of the memorandum is immaterial. In some instances it may be executed even after suit has been brought. Citing Hudson v. King, 49 Tenn. 560.

In Mills v. Mills, 40 Tenn. 705, 706, it was said that a memorandum may be supplied by the written answer of a party to an oral contract which shows the existence of such contract in the face of the answer or other pleading in a judicial proceeding and, as is pointed out in Lusky v. Keiser, 128 Tenn. 705, 164 S.W. 777, L.R.A. 1915C, 400,

a memorandum required by the Statute is not the contract, but written evidence of it.

The Love and Amos-TVA contract is an exhibit in the case setting out the terms concerning the requirements for coal etc., and Exhibit 18 of Vol. II contains a record of the case of Osborne Mining Company against United Mine Workers of America wherein Osborn Mining Company sets forth in the pleading that it was obligated to fill this exact contract referring to the contract number and acknowledging its binding force and effect.

■ As to the terms of the contract with respect to consideration which it is argued by defendants is not shown in the documents relied on hereinabove, it was pointed out in Cobble v. Langford, supra., citing Taylor and Williams v. Ross, 11 Tenn. 330, that it is not necessary that the consideration of the promise be stated in writing in order to maintain an action under the Statute of Frauds.

On the whole we are satisfied that the Treble Damage Statute does apply and that the position of the defendant with respect to applicability of the Statute of Frauds is not well taken.

It is finally argued under the fourth assignment that T.C.A. sec. 47-1706 is not applicable in this case since the damages claimed by the plaintiff result only indirectly or consequently from the defendant's alleged misconduct and that the proof does not show that it was the intention of the Mine Workers to cause injury or damage to Love and Amos, in the absence of which there can be no liability under the foregoing statute.

Our conclusions stated hereinabove sufficiently answer this contention.

From all the foregoing it results that all the assignments of error are overruled and the judgment of the Trial Court is affirmed.

Humphreys and Chattin, JJ., concur.

Affirmed.