KAYSER–ROTH CORPORATION

v.

TEXTILE WORKERS UNION OF
AMERICA, AFL–CIO.

Civ. A. No. 5524.

United States District Court,
E. D. Tennessee, S. D.

July 27, 1972.

Blakeney, Alexander & Machen (J. W. Alexander, Jr.), Charlotte, N. C., O. W. McKenzie, Dayton, Tenn., for plaintiff.

Patricia Eames, Gen. Counsel, New York City, Cooper, Mitch & Crawford (William E. Mitch), Birmingham, Ala., Thrasher, Sherrill & Anderson (Wilkes T. Thrasher, Jr.), Chattanooga, Tenn., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRANK W. WILSON, Chief Judge.

This is an action involving a claim and counterclaim for damages arising out of a strike that occurred at the Kayser-Roth Corporation hosiery plant in Dayton, Tennessee, during the year 1968. The plaintiff, Kayser-Roth Corporation, seeks to recover for alleged unlawful interference with its business activities, alleged conspiracy to interfere with its business activities, and alleged violation of secondary boycott provisions of the Taft-Hartley Act [29 U.S.C. § 158(b)] by the defendant, the Textile Workers Union of America. Defendant, by counterclaim, seeks to recover of the plaintiff for an alleged conspiracy to incite litigation and induce perjury and to unlawfully prevent the defendant from carrying on its activities as a labor union. Each party seeks both compensatory and punitive damages of the other party. The case was tried before the Court sitting without a jury. The Court now enters the following findings of fact and conclusions of law upon the basis of the record established in the case.

### Findings of Fact

(1) Kayser-Roth Corporation, hereinafter sometimes referred to as the "Company," is a corporation organized under the laws of New York and having its principal place of business elsewhere than in Tennessee. At all times relevant to this lawsuit it operated and maintained a plant in Dayton, Tennessee, where it manufactured various lines of men's and women's hosiery. During and prior to 1968, Kayser-Roth Corporation employed in excess of 500 employees at its Dayton, Tennessee plant and was an employer engaged in interstate commerce within the meaning of the National Labor Relations Act.

(2) The defendant, Textile Workers Union of America, AFL–CIO, hereinafter sometimes referred to as the "Union," is an unincorporated labor organization having its principal offices in New York, New York. At all times relevant to the matters here in issue the defendant Union was a labor organization within the meaning of the National Labor Relations Act and was the duly certified collective bargaining agent for all production employees at the plaintiff's Dayton, Tennessee plant.

(3) Beginning in 1964 the defendant Union undertook to organize the production and maintenance employees at the plaintiff's Dayton, Tennessee plant with the result that in September of 1967 the defendant was certified by the National Labor Relations Board as the bargaining agent for these employees. Bargaining between the Company and the Union was not productive of an agreement, however, with the consequences that unfair labor practice charges were brought against the Company by the Union, charging, among other matters refusal to bargain. The charges were sustained by the NLRB and the action of the NLRB was affirmed upon appeal, with the result that the Company was ordered to cease and desist from such practices and to engage in good faith bargaining. See Kayser-Roth Hosiery Co., Inc. v. NLRB, 430 F.2d 701 (6th Cir. 1970). See also Kayser-Roth Hosiery Co., Inc. v. NLRB, 447 F.2d 396 (6th Cir. 1971).

(4) By May of 1968 no agreement had been reached. At that time the Union was being represented in the conduct of

its affairs at the Dayton, Tennessee plant by Adolph Benet, a Vice President of the Union, and by Ted Benton, Walter Rainey, and Robert Beame, each of whom was an authorized and full time representative of the Union. Upon Sunday, May 5, 1968, the Union called a meeting of production and maintenance employees. Of the approximately 500 employees in the bargaining unit, estimates of the number of employees in attendance at the meeting varied between 200 and 350. At this meeting the Company's proposal for settlement was submitted and was rejected. The employees in attendance then voted unanimously to strike the following day.

On the morning of May 6, 1968, a large number of employees, variously estimated to be from 150 to 400, gathered in the vicinity of the plant entrances. There was a great deal of confusion, mass picketing, and blocking of entrances upon the first day of strike, but no violence. Someone padlocked two of the gates of the plant and these locks had to be forcibly removed. The supervisory personnel, of whom there were approximately 20, and the office and clerical personnel, of whom there were approximately 30, reported for work that day, but only about 15 or 20 production or maintenance workers entered the plant to work that day. A strike headquarters was established in a trailer located a short distance from the plant entrances and the Union representatives hereinabove referred to undertook to supervise the strike from this headquarters. Three of the Union representatives, Benet, Benton and Rainey, were present at the strike scene throughout the day and undertook to organize the strikers by appointing picket captains and giving picketing instructions. These instructions included instructions by Benton that the pickets might walk in such a manner as to make entrance at the plant difficult, just so they continued walking. He also gave instructions that the Union would provide bail in the event strikers were arrested in connection with the strike. Walt Rainey told certain of the

picket captains that if too many employees attempted to enter the plant to work, the pickets should stop them by any means they could, including stripping their clothes off, if necessary.

(5) Upon the second day of the strike mass picketing of the plant entrances continued with 30 or 40 pickets circulating in front of each gate. On this day some effort was made by the pickets and other strikers or strike sympathizers to prevent the entrance of vehicles carrying office personnel to work. There appears to have been no attempt by the Union representatives to limit the number of pickets in front of the plant entrances during the first two days of the strike and until an application was made for an injunction against mass picketing on the second day. The Union representatives then assured the state court to whom the application was made that a voluntary limitation of the number of pickets would be effected and that there would be no further interference with traffic coming to and going from the plant.

(6) Although by the third day of the strike there was some reduction in the number of pickets walking in front of the plant entrance, a large number of strikers continued to gather in the immediate vicinity. Supervisory and office personnel and a few production workers continued to enter the plant, but the pickets were sufficient in number and walked in such a manner as to render entrance to and exit from the plant slow and difficult. In the course of the day three company trucks were prohibited by pickets from removing goods from the plant. After some four hours they were permitted to leave the plant only after demonstrating to the pickets that their loads had been removed and that they were empty. Representatives of the Union were present at the picket line during at least a portion of the time that the pickets were thus blocking the plant gates. Whether they were themselves actually participating in the picket lines upon this occasion is disputed, but it is clear that they, as well as the local police

who were also present, did nothing to require the pickets to cease blocking the plant entrances or to permit passage of the trucks.

(7) On the following day large groups of pickets continued to block or partially block the entrances to the plant whenever a vehicle attempted to enter or leave. The windows upon one or more vehicles entering the plant were broken by rocks and other missiles thrown by unidentified persons in the vicinity of the plant gates. When these matters were brought to the attention of the Chancery Court on May 9, 1968, they resulted in that Court entering an injunction prohibiting the strikers from interfering with persons going to or from the plant.

(8) Over the next several days incidents of pickets blocking the entry or departure of company vehicles continued. In fact, it appears that from May 14 through May 21 several company trucks attempted to deliver materials into the plant, but upon each occasion the pickets walked in the entranceway in such a manner that the drivers could not enter or depart from the plant without running into or over the pickets. As a result, no company trucks were able to move merchandise into or out of the plant during that period. The next occasion upon which a company truck attempted to deliver materials to the plant was upon June 25, 1968. The driver of that vehicle was prevented from entering the plant by strikers and was warned not to return. While he was stopped at the plant entrance, one of the tires upon his truck was slashed and substantial damage was later done to the vehicle when he left it to obtain assistance. Throughout this period of time, one or more union representatives continued to check with the picket lines several times daily and were present at the strike headquarters supervising the strike. They appear to have done nothing to prevent pickets from blocking the movement of company vehicles, even when they were personally present at the picket line when this occurred.

(9) The nature of the plaintiff's business was such that during its normal operations it made daily shipments of its finished products to retail stores located throughout the United States. These shipments were largely made through Central Motor Express, Inc., a common carrier having terminal facilities in Chattanooga, Tennessee. In fact, it appears that Central was the only carrier available to the plaintiff which had Interstate Commerce Commission authority to take shipments from Dayton to Chattanooga and interline them with other truck lines having authority to reach the various destination points in the United States. The plaintiff also used Thurston Motor Lines to pick up shipments at its Dayton plant, but this motor carrier could take shipments only for eastern destinations, as it was required to route its shipments through Charlotte, North Carolina. The plaintiff also did a small amount of shipping through United Parcel Service, such shipments however being restricted to shipments not in excess of 40 pounds.

(10) On May 17, 1968, the plaintiff attempted to make certain shipments of finished goods through Central Motor Express. Several trailers were requested for loading. The terminal manager of Central delivered one such trailer for loading, but was blocked by pickets when he attempted to deliver the second trailer. After the Central tractor-trailer unit was held up some 30 minutes at the gate by the pickets, the plaintiff's plant manager called the Sheriff's Office for help in getting the truck into the plant. An officer was dispatched to the strike scene, but he arrested the Central driver for allegedly blocking traffic. As a result of the treatment of the Central driver upon this occasion, Central filed an embargo notice with the Interstate Commerce Commission and refused to resume pickups or deliveries from the Dayton plant until after the reopening of that plant sometime in September of 1968. In the meanwhile, the Central trailer parked at the loading dock had its tires slashed by unknown persons. It remained aban-

doned at the loading dock until September of 1968.

(11) Some three days after the Central tractor-trailer unit had been blocked from entering the plant, and on May 20, 1968, a United Parcel Service tractor-trailer was dispatched to the plaintiff's plant to pick up a shipment of merchandise, but its entry into the plant was also blocked by the pickets and the plaintiff was unable to obtain any further service from that source until after September of 1968.

(12) On May 21, 1968, a supervisor for Thurston Motor Lines succeeded in delivering a trailer to the plaintiff's loading dock, but only after he had been held up for a time by the pickets. While so delayed by the pickets, Ted Benton, the Union representative who was present, sought to persuade the driver not to cross the picket line. After the driver eased his vehicle by the pickets, stones were thrown at him and at his assistant. A short while later, a local law officer appeared at the plant and arrested the driver for an alleged assault upon the pickets in making his entry. The driver was then ordered to take his truck and follow the officer to the local jail. A large number of strikers also followed him to the jail and there made a number of threats against him after he was released upon bail. One Rockholt, the husband of a striker, then attempted to use his vehicle so as to block the tractor-trailer's passage upon the highway as it attempted to depart from Dayton. Rockholt was in turn arrested for this and his fine was paid by the Union. As a result of this treatment of its employees, Thurston Motor Lines refused to provide any further service to the plaintiff at Dayton until it could be assured of adequate police protection for its drivers and equipment.

(13) Because of the difficulties encountered in getting shipments out of its Dayton plant, and in an effort to effect a shipment of finished merchandise scheduled for delivery to customers in June, the plaintiff decided to attempt to move such finished merchandise from Dayton to a warehouse in Burlington, North Carolina, and there to complete the necessary procedures for shipping the merchandise to customers. To accomplish this the plaintiff sought and obtained assurances of additional state and local police protection to enable a common carrier to enter the Dayton plant and remove the merchandise. Upon the basis of this promised protection, Thurston Motor Lines agreed to return their drivers and equipment, with a result that between June 6 and June 20, some 40 to 50 trailer loads of finished merchandise were hastily loaded and moved out of the Dayton plant and delivered to the Burlington, North Carolina warehouse. Included in these shipments were approximately 121,000 dozen pairs of finished "fishnet" products, to which further reference will be hereinafter made. All of the detailed inventory records, shipping instructions, time tables, invoices and bills of lading which were required to effect a final shipment of these goods to customers were retained in Dayton with the anticipation that they could be processed by the office personnel who normally performed that service.

(14) In the meanwhile, and from the commencement of the strike a small number of production and maintenance employees continued to report for work. Upon the first day of the strike only 15 or 20 such employees reported for work out of a total work force of 535 such employees. The number of workers reporting gradually increased so that by June 24 a total of 112 persons reported, including some 60 production workers and approximately 50 office and supervisory personnel.

(15) Throughout the period from the commencement of the strike upon May 6, 1968, until the closing of the plant upon June 25, 1968, quantities of bent nails and glass were strewn in the plant entranceways by unidentified persons. These caused numerous flat tires upon vehicles entering and leaving the plant. In an effort to remedy this situation the Company caused the entranceways to be

washed down with a fire hose each morning, but a new supply of glass and nails was strewn each night.

During the latter part of May 1968 an increasing number of incidents of violence occurred both at or near the picket line and away from the strike scene. Upon various occasions rocks, eggs and other missiles were thrown by assembled strikers at non-striking employees' vehicles as they entered or left the plant, resulting in broken windows and other damage to the vehicles. The evidence reflects that representatives of the defendant Union, including both Benton and Rainey, were present upon one or more occasions when missiles were thrown at non-striking employees' vehicles as they entered or left the plant. They claimed not to have seen such action. Upon other occasions, the homes and automobiles of non-striking employees were shot into and otherwise damaged. The Union provided attorneys to represent persons charged with such acts of violence against non-striking employees, both where such acts occurred at the picket line and where they occurred away from the picket line. After conviction of such persons the Union paid their fines upon several occasions. For example, upon May 23, 1968, two supervisory employees who had taken pictures of picket line activity were assaulted and beaten as they were leaving the Dayton Post Office after having mailed the film for processing. One was hospitalized for apparently serious head injuries received in the assault. The Union provided the two striking employees charged with the assault with bail and with an attorney and upon their conviction paid their fines. Upon another occasion, the home of a non-striking employee, Mrs. Gossett, was shot into during the night. The husband of a striking employee, who incidentally was also the brother of Mrs. Gossett, was charged with the offense. The Union provided him with an attorney and one of the Union representatives, Rainey, testified to an alibi for him. He was nevertheless convicted and the Union then paid his fine.

(16) In an effort to enable non-striking employees who wished to work to do so safely, the Company leased a passenger bus to be used in transporting such workers to and from work. To counter this move, strikers would follow the bus to loading points and there fill the bus, preventing the loading of those workers who desired to work. The strikers would then insist upon riding to the plant where they would dismount and return to the picket lines. Although the Company later acquired a second bus for such use, the jamming tactic continued until the closing of the plant upon June 25. The evidence appears clear that a Union representative, Ted Benton, gave instructions to strikers to follow these tactics and that he later claimed credit for frustrating the Company's effort to transport non-striking workers.

(17) For a period of several weeks following the commencement of the strike, the plaintiff's Dayton plant continued to remain open with limited operations being carried on by the office and supervisory personnel, all of whom continued to report for work and by a small number of non-striking operating personnel who reported. The number of non-striking workers who reported appears to have gradually grown somewhat, so that by June 24 some 60 such workers reported, the largest number that had reported since the commencement of the strike. With these developments some strikers appear to have become somewhat discouraged over the prospects of the strike being successful. When one of them reported her concern to the Union representative, Ted Benton, he is reported to have told her not to quit picketing for "if they get to scabbing us too bad, we will shut the mill down."

(18) The clear weight of the evidence reflects that upon June 24, 1968, the following course of events occurred in connection with the strike. During the course of the morning Ted Benton, who was the only Union representative present in Dayton on that date, gave instructions that the plant was to be shut down that day and for that purpose instruct-

ed that a number of striking employees be called and instructed to report to the picket line at the shift change that afternoon. He then left for Atlanta, leaving no Union representative present in Dayton. That afternoon a large number of strikers assembled in the vicinity of the plant entrances. As the shift ended at 4:30 p. m. and plant personnel attempted to depart from the plant, a hail of rock and missiles struck the departing vehicles. Windows and windshields were shattered upon almost every automobile. A number of windows were broken in the company bus and the assistant driver was injured. Just outside the plant entrance the automobile of one lady worker was set upon by strikers and overturned in the street. Rocks continued to be thrown at the occupants as they sought to climb out of the overturned automobile and one or more of the occupants was injured. The strikers participating in the overturning of the automobile were identified and pled guilty to criminal charges growing out of the incident. The Union paid their fines.

Upon this occasion some 25 or 30 vehicles attempting to leave the plant or parked at the plant were damaged, including a company station wagon which was turned upside down and totally demolished while parked inside the plant area. A number of windows were broken at the plant and other damage done by rocks thrown by strikers.

(19) The clear weight of the evidence likewise reflects that the following events occurred upon June 25, 1968. At opening time a large number of strikers had again assembled at the plant entrances. After the violence of the previous day, only 12 office employees and eight production workers reported for work. Again windows were broken upon several of the cars seeking to enter the plant. One of the office employees seeking to report for work, Susan Lewis Montgomery, had her automobile overturned at the plant entrance when she refused the strikers' demand that she not enter. A striker pled guilty to a criminal charge growing out of this incident and the Union paid his fine. Within a short while only one supervisor and 12 office girls remained at the plant. Because of the threats and violence that had occurred, they became fearful of remaining and sought to obtain assurances from the strikers that they could leave in safety. Upon this occasion a Union representative, Walt Rainey, was present at the picket line and appointed one of the pickets as spokesman in these negotiations. Arrangements were finally made to permit the office personnel to leave unharmed, but only after they agreed to individually come to the picket line and give assurance that they would not again cross the picket line. A further incident occurring upon June 25 was the action of the pickets in preventing the entry of a company truck seeking to deliver materials to the plant and the damaging of the truck on that-date, to which reference was heretofore made in paragraph (8) of these findings.

(20) Following the events that occurred upon June 24 and 25, the Company was unable to get anyone to return to the plant. As a result the plant remained completely shut down from June 25 until September 16, 1968. The plant manager and another company official attempted to re-enter the plant at nighttime upon an occasion some two weeks after its closing to obtain needed records, but immediately a sizable number of strikers appeared at the plant entrances and the officials became fearful for their safety and departed.

Although following the incidents that occurred upon June 24 and 25 Union officials made public statements condemning the violence, they gave private assurances commending the strikers upon the closing of the plant. They gave no assurances to anyone, however, against the repetition of the violence that had closed the plant and took no steps to permit its reopening until a new and more restrictive injunction was issued in September of 1968. To the contrary, they claimed success for their strike efforts following the closing of the plant.

(21) Upon the closing of the plant a contempt action was filed by the Company against the Union and various strikers in the Chancery Court wherein an injunction had previously issued. The result of these proceedings was that a large number of strikers were found to have violated the injunction and to be in contempt. A further consequence of these proceedings was the issuance of an additional injunction limiting pickets to two per entrance and prohibiting all other strikers from assembling in the plant area. After these proceedings and following compliance with the new injunction, the plant reopened upon September 16, 1968. Thereafter a collective bargaining agreement was eventually reached between the parties upon December 2, 1968.

■ (22) Although it is contended by the Union in its counterclaim that the Company engaged in a conspiracy to incite litigation and to induce perjury, all to the injury of the Union, this charge is not supported by the evidence. The defendant relies upon matters developed in the cross examination of the plaintiff's plant manager, Everett Roberson, wherein he had conversations after the strike with certain employees who had participated in the strike, seeking to develop evidence of Union participation in various acts of violence. It appears from this cross examination that the Union sent union members who had been provided with a concealed recording device to discuss with the plant manager the Company's offer of a reward for evidence relating to acts of violence. In the course of these conversations discussions were had regarding the nature of evidence that would be needed to connect the Union with the violence. The evidence does not support the contention that the plaintiff's manager sought to induce the employees to testify falsely or commit perjury. Rather it appears that the employees attempted to solicit such a proposal with the plant manager tending on occasion to accede to the solicitation. In view of the fact that the employees were sent by the Union to entrap the plant manager in this regard, he neither was successful nor could he have been successful even if such had been his purpose. The evidence at most goes to the credibility of the plant manager but does not establish a conspiracy to induce perjury to the defendant's injury.

In further support of its counterclaim, the defendant apparently relies upon the evidence as it relates to three union members who testified against the Union. These three witnesses, Judy Rockholt, Alene Wilkey, and Alma Michael, had each participated in the strike, two of them having served as picket captains and the other having served on the picket line. Having had a disagreement with the Union after the strike over certain personal expenses for which they sought to be reimbursed, they advised the Company of their willingness to testify against the Union. While the circumstances under which they agreed to testify against the Union would be relevant upon the issue of their credibility, their testimony on a number of matters relating to the conduct of the strike is corroborated by other credible evidence. To the extent that their testimony corresponds with the findings of fact as hereinbefore set forth, it is believed to be credible. In any event, these matters do not establish a conspiracy on the part of the plaintiff to induce perjury or incite claims against the defendant.

(23) The plaintiff's proof in regard to damages was limited to two categories of damage, one category being the losses the plaintiff contends it sustained upon a hosiery product referred to in the record as "fishnet" tights and the other category being certain non-routine expenses which the plaintiff contends it was caused to incur as a result of the strike. Under the first category of damage the plaintiff seeks to recover the sum of $2,614,-115.86 as being the loss it contends it sustained upon fishnet merchandise which it held in inventory upon June 30, 1968. Under the second category of damages the plaintiff seeks to

recover the sum of $101,708.78 which it contends was special or non-routine expenses incurred by it as a consequence of the strike.

(24) Turning first to the alleged losses upon fishnet merchandise, it is to be noted that the business conducted by the plaintiff at its Dayton plant consisted of the manufacture of various lines of men's and women's hosiery. Included within these products in 1967 and 1968 was a line of hosiery known as "textured tights" or, as generally referred to in the trade, "fishnet" tights. These tights were a single piece toe-to-waist garment. The textured material or "fishnet" was purchased by the plaintiff in tubular form and then manufactured into finished tights. A portion of the plaintiff's work force at its Dayton plant was devoted to the manufacture of these tights. In addition to the fishnet tights manufactured at the Dayton plant, the plaintiff also contracted for the manufacture of fishnet tights at other Kayser-Roth plants located in Spring City, Tennessee and Tellico, Tennessee. However, all finishing, dyeing, packaging and shipping of fishnet products was conducted exclusively at the Dayton plant. It appears that the Dayton plant was the only plant in the Kayser-Roth system equipped to perform these activities and was the only plant in the system from which customers were supplied with fishnet tights.

(25) At the inception of the strike in May of 1968 the plaintiff had in its inventory at the Dayton plant 311,947 dozen fishnet tights which were fully fabricated and for which it had firm orders. Finishing, dyeing and packaging had been completed upon 121,222 dozen of these garments, with such operations remaining to be performed upon the other 190,725 dozen fabricated but unfinished garments, the latter being referred to in the trade as "greige" goods. Of the 121,222 dozen finished garments, all that remained to be done was to process the paper work required to accomplish shipment and to repack and ship them in accordance with the detailed shipping instructions from individual stores and various chain store systems who were the customers of the plaintiff. Necessary to accomplish these operations were the orders, inventories, control records, shipping timetables, shipping instructions, invoices and bills of lading, all of which were located at the Dayton plant. Some 25 or 30 office employees were in charge of these records and performed the paper work necessary to the shipping of the finished items. The evidence reflects that these records and these operations could not be duplicated elsewhere than at the Dayton plant. Accordingly, with the closing of the Dayton plant upon June 25, 1968, no further shipment of the finished fishnet garments could be made until after the plaintiff reopened its plant on September 16, 1968. The evidence further reflects that but for the closing of the plaintiff's plant upon June 25, 1968, these operations would have been completed in time to meet delivery schedules upon existing orders and in time for the September back-to-school market in so far as concerns the 121,222 dozen finished fishnet tights.

With regard to the remaining 190,725 dozen fishnet garments which were in inventory upon June 30, 1968, but remained unfinished, it was estimated by the plaintiff's plant manager that these garments could have been finished at a cost of $290,110.71. It was further contended that this could have been done with the labor force on hand on June 24, 1968, and in time for delivery before the September back-to-school market but for the closing of the plant upon June 25, 1968 (see Exhibit No. 53). It is apparent, however, that these projections are based upon a number of assumptions, including the following: (1) that but for the closing of the plant upon June 25, the plaintiff would have continued to have not less than 61 supervisory or production workers available for completing the necessary finishing and packaging operations upon the greige goods inventory; (2) that among these would be the requisite skills for perform-

ing the various finishing operations; (3) that all such available employees would have been assigned to the finishing of the fishnet greige goods to the exclusion of all other hosiery lines; (4) that efficient scheduling and utilization of the available employees would enable such finishing operations to be completed within ten weeks; and (5) that such a 10-week finishing schedule would have permitted delivery during June, July and August of all unfinished fishnet greige goods prior to cancellation of orders for late delivery. While the initial assumption, namely that a minimum of 61 supervisory and production workers would have remained available throughout the summer had the strike remained lawful and non-violent, appears to be a reasonable assumption in the light of the record, each of the remaining assumptions is subject to question under the record in this case, for in effect they each appear to be based upon an assumption not only of 100% utilization of available personnel in finishing fishnet greige goods, but also a 100% efficiency in the use of skills and time. While exactness is always difficult in making projections, a 25% to 30% efficiency rate would appear to be a more reasonable anticipation under strike conditions.

The Court is accordingly of the opinion that the evidence fails to preponderate in favor of the plaintiff's contention that but for the violence and other unlawful strike activities it would have finished in time for summer delivery all of its fishnet inventory held in greige goods at the time of the strike (190,725 dozen). Rather, it appears that the evidence would preponderate only in favor of a finding that the plaintiff could have finished and made summer delivery of not more than 30% of such inventory (57,200 dozen) had not violence and other unlawful strike activity closed the plant.

Accordingly, the Court finds that the portion of the plaintiff's loss upon its fishnet inventory attributable to violence and other unlawful strike activity chargeable to the defendant in the course of an otherwise lawful strike would be limited to the loss sustained by the plaintiff upon its inventory of 121,222 dozen finished fishnet tights, plus 30% (57,-200 dozen) of its fishnet inventory held in greige goods.

(26) The evidence reflects that the fishnet tights were a fad, or high fashion item, much in demand in 1967 and during the first half of 1968, but that the fad had largely run its course by the fall of 1968 and the demand accordingly fell rapidly after that date. At the time of the strike in May of 1968, as well as at the closing of the plaintiff's plant upon June 25, 1968, the plaintiff held firm orders from responsible customers sufficient to sell all of its then existing inventory of fishnet tights, both of those finished and those in the greige, provided that it could have finished and shipped such merchandise in June, July or August in time for the September back-to-school market. At the closing of its plant upon June 25, 1968, the plaintiff's average selling price of fishnet tights upon its then existing orders was in the sum of $12.40 per dozen (See Exhibit No. 52). Upon the plaintiff being unable to make delivery upon these orders, either from its Dayton plant or from other sources, in June, July and August, customers turned elsewhere for their supply, leaving the plaintiff without orders for its existing inventory upon the reopening of the Dayton plant in September of 1968. During the remaining months of 1968 the plaintiff sold 65,194 dozen of its fishnet inventory for $726,662.19, or at an average price of $11.14 per dozen (See Exhibit No. 56). During the year 1969 it sold an additional 146,366 dozen for $371,007.01, or at an average price of $2.54 per dozen. In January of 1970 it sold 144,867 dozen for $125,650.25, or at an average price of 87¢ per dozen. Between January and March of 1970 it sold 45,452 dozen at $79,624.13, or at an average selling price of $1.75 per dozen. Its remaining inventory of 35,152 dozen was sold between April of 1970 and June of 1971 for $45,-931.02, or at an average price of $1.30 per dozen. The average price of all fish-

net sales made after the reopening of the plant in September of 1968 was $3.09 per dozen (See Exhibit No. 56). On the basis of an average selling price of $12.-40 before the closing of the plant in June of 1968, additional manufacturing costs of $290,110.71 and an average selling price of $3.09 per dozen, the plaintiff contends that it sustained a loss of $2,614,115.86 upon its inventory of 311,-947 dozen fishnet tights (See Exhibit No. 54).

In making this contention the plaintiff seeks to apply an average order price of $12.40 per dozen upon orders in existence prior to the closing of the plant and an average selling price of $3.09 per dozen received by it after the reopening of the plant in the total liquidation of its fishnet inventory. While the former figure would appear to be established by the evidence (See Exhibit No. 52), the latter figure would not. In addition to the inventory held at the time of the closing of the plant, it includes the sales of fishnet tights completed after the reopening of the plant (See Exhibit No. 56). Rather, it would appear that the sales price received after reopening of the plant should be the actual sales price received by the plaintiff in the various sales of its fishnet inventory, all as set forth in Paragraph (26) above with such actual sales prices to be applied to the fishnet inventory on a first completed-first sold basis. Thus the loss sustained by the plaintiff upon its inventory of 121,222 dozen finished fishnet tights would be as follows:

| | | |
|---|---:|---:|
| 121,222 dozen at $12.40 per dozen (average sales price for cancelled orders per Exhibit No. 52) = | | $1,503,152.80 |
| Less amount received in sales after reopening of plant: | | |
| (a) 65,194 dozen at $11.14 per dozen (Per Exhibit No. 56) = | $726,662.19 | |
| (b) 56,028 dozen (121,222 less 65,194) at $2.54 per dozen (Per Exhibit No. 56) = | $142,311.12 | $868,973.31 |
| Loss on 121,222 dozen finished fishnet tights = | | $634,179.49 |

The loss sustained by the plaintiff upon its inventory of 190,725 dozen fishnet greige goods inventory would be as follows:

| | | |
|---|---:|---:|
| 57,200 dozen (190,725 x 30%) at $12.40 per dozen (Average sales price for cancelled orders per Exhibit No. 52) = | | $709,280.00 |
| Less cost of finishing ($290,110.71 per Exhibit No. 54 x 30%) = | | 87,033.00 |
| | | $622,247.00 |
| Less amount received in sales after reopening of plant: 57,200 dozen at $2.54 per dozen (Sales price per dozen per Exhibit No. 56 Jan.–Dec. 1969) = | | $145,288.00 |
| Loss on 190,725 dozen greige goods fishnet tights = | | $476,959.00 |

The total loss on fishnet tights, finished and unfinished, due to the unlawful strike activity for which the defendant would be responsible would accordingly be as follows:

| | |
|---|---:|
| Loss on finished fishnet tights: | $634,179.49 |
| Loss on unfinished fishnet tights: | $476,959.00 |
| TOTAL | $1,111,138.49 |

(27) As noted in Paragraph (23) of these findings, the plaintiff seeks to recover a second category of damages in the sum of $101,708.78 as special or non-routine expenses alleged to have been incurred by it as a consequence of the strike. As itemized in the plaintiff's Exhibit No. 59, these expenses are as follows:

| | | |
|---|---|---|
| Freight Expense | | $ 30,287.51 |
| Guard Service Expense | | 54,624.27 |
| Bus Expense | | 2,509.00 |
| Cost of reworking goods due to customer cancellation of orders | | 9,264.00 |
| Supplies and Repairs | | 1,524.00 |
| Building Rent-Coble Tobacco Warehouse | | 3,500.00 |
| | TOTAL | $101,708.78 |

The freight expense in the sum of $30,287.51 was incurred in the movement of the plaintiff's finished inventory in an effort to effect delivery and would reasonably appear to be a consequence of the illegal strike activity for which the defendant has been found to be responsible.

As regards the claim for guard expense (Exhibit No. 59, page 3) it is apparent that the major portion of these expenses were incurred as a consequence of lawful strike activity, and not as a consequence of the illegal activity for which the Union would be responsible. The plaintiff incurred in excess of $8,000.00 in guard expense during each of the months of May and October 1968, the former sum being incurred before the closing of the plant and the latter sum being incurred after the plant had reopened under lawful strike conditions. The average monthly guard expense for these two months was in the sum of $8,364.00. It is accordingly reasonable to assume that but for the illegal strike activity resulting in the closing of the plant the plaintiff would nevertheless have incurred guard expense in the average sum of $8,364.00 per month. In line with this, the plaintiff would be entitled to recover only the amount in excess of this monthly average, or the sum of $4,440.46, as guard expense incurred by reason of illegal strike activity.

It does not sufficiently appear that the bus expenses ($2,509.00) and the supply and repair expenses ($1,524.00) were the consequence of illegal strike activity for which the defendant would be responsible.

The cost of reworking goods in the sum of $9,264.00 due to the cancellation of orders, as well as the cost of rental of a warehouse in the sum of $3,500.00, would each appear to be a consequence of illegal strike activity and hence recoverable.

The Court accordingly finds that the plaintiff was caused to incur special expenses in the sum of $47,493.97, being the total of the above allowed items, by reason of the illegal strike activity for which the defendant would be responsible.

### Conclusions of Law

(1) This Court would have jurisdiction of the parties and, pursuant to 29 U.S.C. § 186, would have jurisdiction of the plaintiff's cause of action alleging violation by the defendant of the secondary boycott provisions of the Taft-Hartley Act [29 U.S.C. § 158(b)(4)]. The federal claims having apparent substance, the Court would likewise have pendent jurisdiction over the non-federal causes of action, being both the plaintiff's claim for unlawful interference with business activities and for alleged conspiracy to interfere with its business activities and the defendant's counterclaim for alleged conspiracy to incite litigation and induce perjury. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1956).

(2) The original action herein being an action for damages against a labor union growing out of a labor dispute, the standard of proof required to establish liability would be as set forth in Section 6 of the Norris-LaGuardia Act (29 U.S.C. § 106) wherein it is provided:

"No officer or member of any association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members or agents except on clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

"Clear proof," as used in the foregoing statute, was defined in the case of United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), as follows:

"Although the statute does not define 'clear proof,' its history and rationale suggests that Congress meant at least to signify a meaning like that commonly accorded such similar phrases as 'clear, unequivocal and convincing proof.' Under this standard, the plaintiff in a civil case is not required to satisfy the criminal standard of reasonable doubt on the issue of participation, authorization or ratification; neither may he prevail by meeting the ordinary civil burden of persuasion. He is required to persuade by a substantial margin, to come forward with 'more than a bare preponderance of the evidence to prevail.' "

■ As stated by the Court in a recent case arising from this District, Ramsey v. United Mine Workers, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971): " . . . § 6 requires clear and convincing evidence only as to the Union's authorization, participation in, or ratification of acts allegedly performed on its behalf." As to all other issues the usual preponderance of the evidence rule generally applicable to civil cases would apply.

■ (3) The evidence fails to sustain the plaintiff's secondary boycott allegations. The secondary boycott ban of the Taft-Hartley Act [29 U.S.C. § 158(b)(4)] does not prohibit conduct on the picket line at the site of the primary strike even when such conduct involves the employees of third parties. As stated by the Court in the case of National Labor Relations Board v. International Rice Milling Co., Inc., et al, 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277 (1951):

"A union's inducements or encouragements reaching individual employees of neutral employers only as they happen to approach the picketed place of business generally are not aimed at concerted, as distinguished from individual, conduct by such employees. Generally, therefore, such actions do not come within the proscription of § 8(b)(4) and they do not here."

■ Moreover, the fact that the picket line activity was accompanied by violence does not change the primary nature of such activity. As stated by the Court in United Steel Workers of America v. NLRB, 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964):

"In the instant case the violence on the picket line is not material. The complaint was not based upon that violence as such. To reach it the complaint more properly would have relied upon § 8(b)(1)A or would have addressed itself to local authorities. The substitution of violent coercion in place of peaceful persuasion would not in itself bring the complained of conduct into conflict with § 8(b). It is the object of union encouragement that is proscribed by that section, rather than the means adopted to make it felt."

■ Although there was proof in the record of hostile strike activity on one or two occasions directed at common carriers and their employees at places remote from the primary strike scene, the evidence in this regard is insufficient both in the nature of such activities and in the lack of a showing of union re-

sponsibility for such activity to constitute a cause of action for secondary boycott.

■ (4) The evidence likewise fails to establish a conspiracy between local law enforcement officials and the Union to prevent non-striking employees and others from coming to or leaving the plant. Although it does appear that local law enforcement officials may upon occasions have stood idly by while acts of violence and other unlawful acts were being committed in their presence or may even have acted in a manner to further the restriction of movement in and out of the plant, the Court is of the opinion that the evidence fails to establish any conspiracy between the Union and local law enforcement officials in this regard.

(5) The evidence also fails to establish that the plaintiff participated in a conspiracy to induce perjury or incite litigation against the defendant or otherwise unlawfully prevent the defendant from carrying on its activities as a labor organization, all as alleged in the defendant's counterclaim.

■ (6) The clear and convincing weight of the evidence establishes that the Union authorized, ratified and approved, and was accordingly responsible for, numerous acts of force and violence and other conduct which unlawfully prevented the plaintiff from moving materials and merchandise into and out of the plant at Dayton, Tennessee, unlawfully prevented office and supervisory personnel, as well as non-striking employees who desired to work, from entering the plant and unlawfully closed the plant upon June 25, 1968, and prevented its reopening until September 16, 1968, all as heretofore set forth in the findings of fact. While the losses sustained as a consequence of lawful strike activity are not recoverable, it is well settled in Tennessee that damages inflicted as a consequence of violence, mass picketing, intimidation and coercion in the course of a strike are recoverable. McDaniel v. Textile Workers Union, 36 Tenn.App. 236, 254 S.W.2d 1 (1952); International UAW v. American Metal Products Co., 56 Tenn.App. 526, 408 S.W.2d 682 (1964); UMW v. Meadowcreek Coal Co., 263 F.2d 52 (6th Cir., 1959); UMW v. Osborn Mining Co., 279 F.2d 716 (6th Cir., 1960); Allen v. UMW, 319 F.2d 594 (6th Cir., 1963); White Oak Coal Co., Inc. v. UMW, 318 F.2d 591 (6th Cir., 1963); Lewis v. Pennington, 257 F.Supp. 815 (E.D.Tenn., 1966); Love & Amos Coal Co. v. UMW, 53 Tenn.App. 37, 378 S.W.2d 430, U.S. cert. den. 376 U.S. 971, 84 S.Ct. 1137, 12 L.Ed.2d 85.

■ (7) The plaintiff sustained losses and damages in the total sum of $1,158,632.46 as a direct and proximate result of violence and other unlawful strike activity which the clear weight of the evidence establishes that the defendant Union either authorized, ratified or participated in. These losses and damages consist of losses in the sum of $1,111,138.97 upon fishnet tights and special expenses in the sum of $47,493.97. The plaintiff is entitled to recover a judgment against the defendant accordingly.

■ (8) In view of the fact that the plaintiff has itself heretofore been found guilty of unfair labor practices precipitating the strike [See Kayser-Roth Hosiery Company, Inc. v. NLRB, 447 F.2d 396 (6 Cir. 1971)], in view of the compensatory damages awarded, and in view of all of the circumstances shown in the evidence, the Court is of the opinion that no award of punitive damages should be made herein.

A judgment will enter in accordance with these findings of fact and conclusions of law.