**KAYSER–ROTH CORPORATION,**
**Plaintiff-Appellee,**

v.

**TEXTILE WORKERS UNION OF AMER-
ICA AFL–CIO, Defendant-Appellant.**

**No. 72–2175.**

United States Court of Appeals,
Sixth Circuit.

Argued April 6, 1973.

Decided May 31, 1973.

Wilkes T. Thrasher, Jr., Thrasher, Sherrill & Anderson, Chattanooga, Tenn., Patricia E. Eames, Joel Ronald Ax, Textile Workers Union of America, New York City, for defendant-appellant.

O. W. McKenzie, Dayton, Tenn., J. W. Alexander, Jr., B. H. Boswell, Blakeney, Alexander & Machen, Charlotte, N. C., for plaintiff-appellee.

Before PECK and LIVELY, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

JOHN W. PECK, Circuit Judge.

On January 19, 1969, the Kayser-Roth Company filed this action against the appellant Textile Workers Union of America in the Circuit Court of Rhea County, Tennessee, seeking recovery for damages arising from a strike that occurred at the Kayser-Roth hosiery plant in Dayton, Tennessee, in 1968. The company's complaint presented three theories for recovery: tortious interference with business, conspiracy to interfere with business, and violation of the federal secondary boycott laws. On February 10, 1969, the appellant union caused the action to be removed to the Federal District Court for the Eastern District of Tennessee, and filed a counterclaim charging the company with an unlawful conspiracy to incite litigation, to induce perjury and to prevent the union from carrying out its lawful activities. The company denied the allegations of the counterclaim.

A trial was had to the District Court sitting without a jury, and the Court made extensive findings of fact and conclusions of law which are reported at 347 F.Supp. 801 (E.D.Tenn.1972), and which need not be repeated here. The Court found that the company had sustained losses and damages of $1,158,632.-

46 as a direct result of violence and unlawful strike activity which the union either participated in, authorized or ratified. The Court found that the evidence was insufficient to establish an unlawful secondary boycott, and also found that the union failed to establish its counterclaims. The union has perfected this appeal from the judgment of the District Court.

The union's first contention is that the District Court lacked jurisdiction over the non-federal causes of action when it denied relief to the company upon its only federal claim, the violation of the secondary boycott provisions of the Taft-Hartley Act, 29 U.S.C. § 158(b)(4). At this point, the union contends, it became clear that the state claim was the real body of the case and that it should have been dismissed from the federal court.

 The only findings necessary to support the District Court's exercise of pendant jurisdiction over the non-federal causes of action are that the federal claim has apparent substance and that the state and federal claims derive from a common nucleus of operative fact. United Mine Workers of America v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Although the evidence did not warrant a finding for the company on the issue of secondary boycott, the evidence did indicate that there was substance to the company's allegations. For example, the company offered evidence tending to show that the union violently intimidated employees of neutral common carriers to the extent that they ceased to do business with the company, 347 F.Supp. at 805–806. And not only did the union not contest the jurisdiction of the District Court, *the case was removed from the state court upon the union's motion.* Given the expenditure of judicial time and energy on this case, and given the common nucleus of operative fact, we cannot say that the exercise of pendant jurisdiction by the District Court was an abuse of its

discretion. *Gibbs, supra,* 383 U.S. at 725–726, 86 S.Ct. 1130; Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); Ritchie v. United Mine Workers, 410 F.2d 827, 831–832 (6th Cir. 1969); Connecticut General Life Ins. Co. v. Craton, 405 F.2d 41, 48 (5th Cir. 1968); Price v. United Mine Workers, 336 F.2d 771, 776 (6th Cir. 1964); Rumbaugh v. Winifrede Railroad Company, 331 F.2d 530, 539 (4th Cir. 1964).

 Secondly, the union contends that the evidence did not warrant the judgment because the company failed to show that the union was responsible for, participated in, authorized or ratified the acts complained of. Such a showing is necessary under the Norris-LaGuardia Act, which provides:

"No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, membes or agents, *except on clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts, after actual knowledge thereof.*" 29 U.S.C. § 106. (Emphasis supplied.)

The statutory requirement of "clear proof" lies somewhere between the traditional burdens of reasonable doubt and preponderance of the evidence. *Gibbs, supra,* 383 U.S. at 737, 86 S.Ct. 1130. A review of the relevant evidence and of the reported findings of the District Court indicates that the company did meet this burden of proof on the issues of participation, authorization and ratification of numerous acts of violence by the strikers.

The involvement of the union in the violence and other unlawful and damage causing activities during the strike is demonstrated most clearly by the actions of Adolph Benet, the union's International Vice President, and Ted Benton and Walter Rainey, its Interna-

tional Representatives. During the course of the strike, these union officials personally participated in, observed, supervised and controlled the activities of the strikers. They leased property adjacent to the plant site for use as a strike headquarters; a mobile office was moved onto this property, and a shelter for the strikers was also provided. Other evidence indicated that Benton instructed the pickets to walk in such a manner as to make entrance to the plant difficult. Rainey instructed them that they should stop non-strikers from entering the plant by any means they could, including stripping off their clothes. Benton admitted that he was at the picket line from the beginning of the strike until the plant was closed supervising strike activities; Rainey spent about one-half of his time assisting Benton in the supervision of the strikers. During this period, numerous acts of extreme violence occurred which are fully recounted in the opinion of the District Court. In their capacity as strike supervisors for the union, Rainey and Benton observed groups of strikers while they blocked, stoned, and in some cases overturned vehicles bearing non-strikers attempting to enter or leave the plant.

Benton admitted that he was aware of the systematic daily implantation and re-implantation of nails and broken glass on company driveways, and when the company sought to provide bus service for non-striking workers, Benton personally directed the strikers to jam the buses to prevent boarding by non-strikers. The company eventually capitulated to the violence, and the plant was closed on June 24, 1968. Thereafter, the striking employees effectively prevented its reopening until September 16, 1968.

Nevertheless, the union maintains that it cannot be held responsible for the acts of violence committed by the strikers. This argument is not persuasive for several reasons. First of all, the union, as part of its program of conducting the strike, promised to protect the strikers against charges of criminal activities.

The union provided bail bonds and defense counsel for all strikers who were arrested, all but one of whom pleaded guilty, and all of whom were convicted. Fourty-three strikers, including Benton and Rainey, were charged with and were convicted of criminal contempt for failure to abide by the state court injunctions; all were represented by union counsel. The union paid over $167,000 in attorney's fees and over $155,000 was spent on strike benefits, appeal bonds and fines. Secondly, although the union asserts that it attempted to cool an explosive strike situation, it continued to pay strike benefits to strikers who pleaded guilty to criminal charges, and it provided free counsel and paid the fines of all strikers who were arrested and charged with criminal conduct or criminal contempt.

On the issue of ratification, which alone would be sufficient to justify an award under the Act, the company showed that when Benton returned from Atlanta after the two days of extreme violence, he congratulated some of the strikers for a job well done in closing down the plant. In its widely distributed magazine, the union boasted that "When they get angry enough to do things here in Tennessee they go all the way. The strike is 100% effective. The hosiery factory in Dayton seems to have been 'struck by a plague' . . . ." Benton testified that these statements were not retracted by the union. The union wrote various union confederates letters in which it was stated that even though the company had attempted to continue plant operations, "we have the soldiers to win this battle," and that the union had "frustrated every move" the company made.

The union's contention that the finding of the District Court that the union representatives authorized, ratified and condoned the violent acts complained of was based only upon the testimony of three witnesses whose credibility was impeached is not well taken. First of all, the court found that this testimony was in

fact corroborated by other evidence in the case, 347 F.Supp. at 809, and secondly, the evidence concerning credibility goes only to weight, not to admissibility. On the basis of the record before us, we will not disturb the findings of the District Court on this question.

> "What is required [in order to warrant a finding of ratification] is proof, either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts which were in themselves actionable under state law or intentionally drew upon the previous violence for their force." *Gibbs, supra,* 383 U.S. at 739, 86 S.Ct. at 1146.

The company offered clear proof that the union not only approved of the violence which occurred but that it, through several of its highest ranking officers, conducted, encouraged, authorized and participated in acts of violence which were violative of state law. The union's contention that the proof on these points is not clear proof is without merit.

■ The union next contends that the company should not be permitted to recover damages which it would not have incurred had it not violated the National Labor Relations Act. This contention is based upon the fact that the National Labor Relations Board has determined that the company violated the Act by refusing to bargain in good faith during contract negotiations prior to the strike. Kayser-Roth Hosiery Co., 166 N.L.R.B. 372; Kayser-Roth Hosiery Co. v. N.L.R.B., 430 F.2d 701 (6th Cir. 1970); Kayser-Roth Hosiery Co. v. N.L.R.B., 447 F.2d 396 (6th Cir. 1971). The union's argument is in essence a contention that the results of picket line violence should be treated as additional penalties to be imposed upon a company whose unfair labor practices have caused a strike. This argument fails to consider that special appropriate remedial sanctions are available for unfair labor practices by a company, as have been invoked in this case. Furthermore, the Supreme Court has rejected the argument that violence by strikers should not be reimbursable if the strike was caused by the unfair labor practices of the company.

> " . . . [R]eprehensible as was that conduct of the respondent [company], there is no ground for saying that it made respondent an outlaw or deprived it of its legal rights to the possession and protection of its property. The employees had the right to strike but they had no license to commit acts of violence or to seize their employer's plant. . . . To justify such conduct because of the existence of a labor dispute or of an unfair labor practice would be to put a premium on resort to force instead of legal remedies and to subvert the principles of law and order which lie at the foundations of society." N.L.R.B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 253, 59 S.Ct. 490, 495, 83 L.Ed. 627 (1939).

■ In appealing from the amount of the judgment, the union does not deny that substantial damages were suffered; instead it contends that the company's proof of loss was not sufficiently documented and that the company failed to mitigate its losses. The District Court carefully distinguished between the losses sustained as a consequence of the lawful strike activity, which it ruled were not recoverable, and the losses which resulted directly and proximately from the violence and other unlawful strike activity, which it ruled were recoverable upon a showing of the "usual preponderance of the evidence rule generally applicable to civil cases." 347 F.Supp. at 814.

The company's evidence proved that the orders necessary to shipping the finished goods still in the plant when it was closed existed only in that plant and that access to the plant was being denied to all officers and employees of the company. Efforts were made with customers to obtain copies of these orders and new shipping instructions, but these efforts were of no avail. In addition, the union's assertion that the company failed

to make additional attempts to enter the plant to regain control of the needed records and documents is not persuasive in light of the testimony concerning violence directed at virtually every employee of the company who attempted to cross the picket line. The company cannot be held to be liable for having failed to attempt to gain access to its plant under the existing circumstances. If anything, this cautious approach served to prevent additional violence and attendant additional damage.

Evidence indicated that binding orders were received by the plant for 386,774 dozen fishnet tights, most of which orders were not able to be shipped. The company established that other plants in the area could not have finished or shipped these goods, because the Dayton plant was the only company plant which was equipped to fabricate, dye, package and ship fishnet goods. Testimony also showed that the other Kayser-Roth plants were already engaged to capacity in the production of other different types of hosiery.

The union also appeals from the District Court's dismissal of its counterclaim, asserting that the company had conspired to subject the union to vexatious and improper suits and that the company had sought to procure perjured testimony through threats and bribery. The conspiracy claim stems from a reward offer which the company made at the height of the violent attacks against its non-striking employees, which is a legitimate method of obtaining aid in the apprehension of criminals and which cannot be considered as inciting litigation. The perjury action is based upon the assertion that the company's manager sought to induce employees to testify falsely. However, the evidence showed that these employees approached the manager armed with hidden recording devices, and attempted to solicit a proposal from him which might tend to incriminate him. They were not successful, and the District Court's dismissal of the union's counterclaims will not be disturbed.

We have considered the remaining contentions of the appellant and find them to be without merit. The judgment of the District Court is affirmed.