CHARLES D. BONANNO LINEN SERVICE, INC., et al., Plaintiffs,

v.

William J. McCARTHY, et al., Defendants.

Civ. A. No. 75–3313–K.

United States District Court, D. Massachusetts.

June 30, 1982.

Supplemental Opinion July 29, 1982.

Morris Michelson, Lepie & Coven, Boston, Mass., Howard I. Wilgoren, Boston, Mass., co-counsel, for plaintiffs.

Grady & McDonald, James T. Grady, Gabriel Dumont, Boston, Mass., for defendants.

## OPINION

KEETON, District Judge.

This is an action for compensatory damages filed by plaintiff Charles D. Bonanno Linen Service, Inc. ("Bonanno") against defendant Teamsters, Chauffeurs, Warehousemen and Helpers Union Local No. 25 ("Local 25"), an affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and individual defendants who are members of Local 25.[1] The action was tried before the court without a jury on September 24, 25, and 28, 1981 and October 14, 21, and 30, 1981. All findings of fact stated in parts I and II *infra* are from a preponderance of the evidence. Findings of fact in parts III and IV *infra* are based on clear proof. Evaluative findings and conclusions of law are stated in the remaining portions of this opinion.

[1.] The individual named defendants are William McCarthy, Herbert Salter, Gerald Halloran, Peter Forrest, Arthur Moran, Jack Kerwin, John O'Malley, Ernest Zimmerman, and Joseph Caico. Defendants McCarthy and Salter are also named in their capacities as officers of Local 25.

## I.

This action arises from a labor dispute between Bonanno and Local 25 that began in the spring of 1975. Bonanno is a Massachusetts corporation with its principal place of business in Medford, Massachusetts where it conducts a retail and commercial dry-cleaning and laundry service operation. A portion of that business involves the renting and distributing of linens, uniforms, and related products. As part of its distribution operation, Bonanno employed twelve truck drivers in the spring of 1975. At that time the drivers were working under a collective bargaining agreement negotiated between their representative union, Local 25, and the New England Linen Supply Association ("Association"), a multi-employer bargaining group whose membership included Bonanno. During March and April of 1975, Local 25 and the Association were unable to reach an agreement on a new contract, and in June of 1975 Local 25 terminated the then-existing collective bargaining agreement. The membership of Local 25 voted in favor of a selective strike on June 18, 1975, and shortly thereafter union leaders selected Bonanno as the target company. On June 23, 1975 the union announced its decision and the Bonanno drivers commenced picketing. The following day most members of the Association imposed a lockout on Local 25 employees. This lock-out ended on November 21, 1975, when Bonanno withdrew from the Association.[2] The strike and the picketing at Bonanno, however, continued until August, 1977.

Between June 23, 1975 and September 8, 1975, Local 25 maintained picket lines at Bonanno during most hours of the day and night. The pickets, sometimes numbering as many as forty persons, frequently massed in the morning and the midafternoon hours, at which times the Bonanno trucks, which were being driven by route supervisors and replacement employees, would be leaving or returning to the plant. The pickets blocked the paths of trucks, verbally abused substitute drivers, harassed production employees, and obstructed the entrance to the retail store located at the front of the plant. The mass picketing continued until September 8, 1975, at which time this court issued a temporary injunction restricting the number of pickets.[3] Although the picketing continued each day and on many evenings after September 8, 1975, there were rarely more than fifteen pickets present at the plant at any one time. The number of pickets decreased further after November 21, 1975 when the lock-out ended and members of Local 25 (other than Bonanno drivers) returned to work.

Throughout most of the strike, the picketing at Bonanno was accompanied by acts of violence. Employees were threatened with physical injury, trucks were sprayed with paint, windshields were broken, burning cigarettes were tossed into trucks containing inflammable linens, incendiary flares were thrown into the yard, nails were strewn at the exit gate of the yard, windows in the plant were smashed, the gate to the plant was rammed with an automobile, a wire to the fire alarm system on the roof of the plant was cut, a bullet was fired into the plant, and a truck was damaged on the street leading from the plant when a picket driving an automobile intentionally caused a collision.

**2.** In a separate action brought by the National Labor Relations Board against Bonanno, it was determined that Bonanno's unilateral withdrawal from the Association and Bonanno's refusal to implement the collective bargaining agreement executed in April, 1976 between Local 25 and the Association constituted an unfair labor practice. *See Charles D. Bonanno Linen Service, Inc. v. NLRB,* 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982).

**3.** This action, as originally filed, included other Association companies as plaintiffs. On Sep-

tember 8, 1975 Judge Tauro, to whom the case was then assigned, issued a temporary restraining order limiting the number of pickets permitted at the location of any one Association member to the number of drivers who were striking or were locked out at that location. This order, which by stipulation of the parties was treated as a temporary injunction, was affirmed by the First Circuit on March 15, 1976. *See Charles D. Bonanno Linen Service, Inc. v. McCarthy,* 532 F.2d 189 (1st Cir.1976).

The violence also occurred along delivery routes and at the homes of substitute drivers. In July, 1975 Richard Smith, a route supervisor who was substituting as a driver during the strike, was brutally attacked and clubbed by two men with blackjacks. During the attack, which occurred along a delivery route in Boston, Smith was told that he would be killed unless he stopped driving for Bonanno. Subsequently, other substitute drivers were warned that they too would suffer a similar fate unless they stopped driving for Bonanno. On one occasion pickets followed John Doherty onto a highway and attempted to run his truck off the road. In another incident pickets followed Charles Chivakos, induced him to step out of his truck, and then drove their vehicle at him. Trucks were regularly followed by pickets along delivery routes, a practice that began during the summer of 1975 and intensified during the fall and winter. On more than one occasion when trucks were left unattended after being followed by pickets, tires were slashed, windows were broken, or invoices were stolen.

Acts of violence were also directed at persons other than substitute drivers. For example, security guards who were hired to patrol the plant or to accompany drivers on delivery routes were threatened by pickets. In September, 1975 one guard was physically attacked in front of the plant by Gerald Halloran, the Local 25 shop steward at Bonanno. Other persons who were threatened by pickets include Charles Bonanno, the owner of the company, David Holsberg, the plant manager, and John McBride, an engineer at the plant.

Most of the acts of violence by pickets occurred during 1975. After January of 1976 the violence was sporadic. There were approximately eight incidents of violence during all of 1976, the most serious of which occurred in the spring when a group of pickets threw rocks at Bonanno trucks and plant windows. Picketing at the site continued on a regular basis throughout most of 1976 in small numbers, and as late as November, members of Local 25 sometimes picketed at night. Although the picketing continued until August, 1977, the only incident of violence during the last year of the strike occurred in June when an incendiary flare was thrown into the yard of the plant.

During the course of the strike, Bonanno attempted to maintain order on the picket lines and to protect its employees and property in various ways. On the first day of the strike, Bonanno made arrangements with Guard Dogs, Inc., a private security service, to bolster plant protection. Since the Medford police department was unable to assign officers to the picket lines until the evening of June 27, 1975, Guard Dogs, Inc. provided all protective services for Bonanno during the first days of the strike. Each day, John McLaren of Guard Dogs, Inc., the supervisor of the security guards, would consult with managers from Bonanno and assign guards to the plant based on the size of the picket line and reports of violence. During the daytime hours of the first week of the strike, the primary duty of the guards was to maintain order along the picket lines. The security guards would open the picket lines to allow trucks, employees, and customers to pass through the gate or the entrance to the store. In addition, security guards would drive to delivery sites to check on the safety of substitute drivers and would respond to specific requests for assistance by drivers along their routes. Beginning sometime during the first week of the strike, private guards were also used to transport employees to work. Bonanno arranged a shuttle for the protection of the approximately eighty production workers, most of whom were women, because these employees were being verbally and physically harassed by pickets each day as they attempted to walk through the picket lines. Using Bonanno vehicles, guards would drive to designated locations, pick up the employees and transport them to the plant. The guards operated this shuttle until September, 1975.

The primary daytime activity of the guards changed after the attack on Richard Smith. Because of the attack and the continued threats and incidents of truck-following by pickets, drivers demanded more protection. Beginning on July 9, 1975, the

day after the attack, Bonanno made arrangements through McLaren to have security guards accompany drivers along delivery routes. Typically, one guard would accompany each driver, although in situations where an additional guard was needed to protect both the driver and the truck, McLaren would supplement the escort service by functioning as a second guard himself. This escort service for drivers continued until March of 1976.

Beginning on June 27, 1975 and lasting until October 10, 1975, Bonanno also hired Medford police officers to control picket lines and protect the plant property. Between June 28, 1975 and August 22, 1975 Bonanno maintained at least two policemen on duty twenty-four hours a day. From August 25, 1975 until September 12, 1975 two police officers patrolled picket lines on weekdays from 6:00 a.m. until 6:00 p.m. On September 15, 1975 Bonanno decreased the patrol to one officer. Finally, beginning on October 6, 1975 and ending on October 10, 1975, one policeman was on duty at Bonanno from 6:00 a.m. until 10:00 a.m. Thereafter, with one exception on December 12, 1975, Bonanno did not use police officers as part of its daily security arrangements at the plant. Instead, Bonanno maintained private security guards at the site on a twenty-four hour basis. This continued until July, 1976, at which time the use of guards was limited to weekends and weeknights.

Security at Bonanno during non-work hours changed over the course of the strike, consisting at different times of combinations of policemen, private guards, and dogs. In April, 1975, in anticipation of a likely strike and the possibility of violence, Bonanno completed the construction of a chain link fence on its property. The fence, together with the plant building, enclosed a yard where Bonanno parked its vehicles. Beginning in May, 1975 this enclosed area was patrolled during the evenings and on weekends by two yard dogs supplied by Guard Dogs, Inc. The dogs were brought to the yard by a handler, left unattended overnight, and removed from the yard the next morning. When the strike commenced and it was learned that the picketing would continue during the evenings, it was decided that the dogs should not be left in the yard unattended. This decision was made because of McLaren's concern for the safety of the dogs, and also because it was recognized that the dogs would not be able to protect the plant building from vandalism. Moreover, Bonanno was concerned with the possibility of violence because of disturbances that had occurred during a strike in 1972 against Bonanno by Local 25. For these reasons, McLaren assigned a security guard to patrol the plant along with the two yard dogs. On the second day of the strike nails were found strewn at the exit gate of the plant, and one night shortly thereafter a wire to the fire alarm system on the roof of the plant was cut. Because of these incidents, and the continual presence of pickets at night, Bonanno increased its evening security. Additional guards were assigned to the plant and the yard dogs were replaced with attack dogs so that guards could move freely inside the yard itself.[4] This changed on June 27, 1975 when Medford police officers began to guard the plant during the evenings and on weekends. From June 28, 1975 until August 22, 1975, Bonanno ceased using both dogs and private guards at night, except on occasions when private guards were used to supplement the police personnel. After August 22, 1975, private guards accompanied by attack dogs, or in combination with yard dogs, once again became the usual method of providing evening security at the plant. Each day McLaren, in consultation with Bonanno management, would determine the number of guards to use that evening based on the size of the picket line and on whether there were reports of incidents of violence during the day. This method of protecting the plant property continued until April, 1977, at which time yard dogs without security guards were again used on weeknights. Finally, in July, 1977 Bonanno

---

4. Unlike a yard dog, which is trained to attack automatically any intruder other than its han-
dler, an attack dog is trained to attack only on command from the security guard.

completely eliminated the use of private guards and returned to using yard dogs alone during evenings and weekends.

Almost all of the private security services during the strike were performed by Guard Dogs, Inc. and Gallant Security Service, a successor company that was owned and operated by McLaren. Occasionally, during the summer of 1975, McLaren subcontracted for additional guards from Investigators Services Bureau, Inc. and Wackenhut Corp., two independent security guard services. These companies would bill Bonanno directly for the additional guards provided. Many of the private security guards who were used during the strike were licensed to carry firearms. Shotguns were kept at the Bonanno plant for security purposes and were sometimes placed in trucks when guards accompanied drivers on delivery routes. In addition, guards who were licensed to carry handguns frequently did so when protecting the plant or escorting drivers. At no time during the strike, however, was a firearm discharged by a security guard, although on one occasion a guard used mace to subdue an attacking picket.

## II.

In this action plaintiff seeks compensation from defendants for expenses incurred as a consequence of the violence that occurred during the strike. Plaintiff seeks compensation for the expense of providing police and private security guard protection at the plant (not including the cost of using guard dogs during evenings and weekends), and compensation for the expense of providing escorts for employees and substitute drivers. In addition, Bonanno seeks compensation for the cost of repairing trucks

and plant property damaged during the strike, and for costs directly associated with the attack on Richard Smith, including medical expenses, towing charges, and the cost of replacing Smith's wrist watch, which was destroyed during the attack.

I find that Bonanno incurred the following expenses during the course of the strike:

Expenses for Plant Protection

| | |
|---|---|
| Medford Police (6–27–75 to 10–10–75; 12–12–75) | $34,628.00 |
| Guard Dogs, Inc. (8–18–75 to 4–23–76) | 21,915.00 |
| Guard Dogs, Inc. and Gallant's Security Service (4–24–76 to 1–2–77) | 23,984.12 |
| Gallant's Security Service (1–3–77 to 7–10–77) | 9,329.25 |

Expenses for Escort Services for Drivers and Employees

| | |
|---|---|
| Guard Dogs, Inc. (6–30–75 to 3–1–76) | 35,632.14 |
| Wackenhut Corp. and Investigators Services, Inc. (July to September 1975) | 6,886.16 [5] |

Expenses for Assorted Private Security Services

| | |
|---|---|
| Guard Dogs, Inc. (6–23–75 to 6–27–75) | 2,188.00 [6] |

Expenses Relating to the Attack on Richard Smith

| | |
|---|---|
| Cost of towing Smith's vehicle to Bonanno plant after the attack | 31.00 |
| Cost of replacing Smith's watch damaged during the attack | 47.20 |
| Medical care expenses | 161.20 |

Expenses Relating to the Repair of Bonanno Trucks Damaged During the Strike

| | |
|---|---|
| Repair of 3 windshields (8–14–75 to 9–19–75) | 199.90 |
| Repair of 8 tires (8–5–75 to 9–11–75) | 369.48 |
| Repairs to front end of truck damaged during collision on 8–7–75 | 1,025.23 |
| Service call to start truck (10–27–75) | 28.20 |

Expenses for Repair of Plant Windows

| | |
|---|---|
| Assorted Windows (8–19–75 to 1–21–76) | 113.41 |
| Plate-glass window (2–20–76) | 217.61 |

5. From circumstantial evidence relating to the timing of payments to Wackenhut, and from findings discussed in part I *supra,* including findings that McLaren used guards from Wackenhut to supplement his own staff and that Wackenhut billed Bonanno directly for these services, I find that the payments indicated in Plaintiff's Exhibit 9 are entirely for escort services rendered by Wackenhut during the strike.

6. During the first five days of the strike, guards working alone or with attack dogs performed all security services at the plant. These services included controlling the picket lines, escorting employees, and protecting the plant at night. The invoice of June 30, 1975, unlike all other invoices from Guard Dogs, Inc. (*see* Plaintiff's Exhibit 5), does not clearly distinguish between the different types of services provided.

I find that plaintiff incurred liability for expenses in the amounts stated above and that plaintiff paid all amounts in full.[7]

Plaintiff's right to recover any or all of these expenditures as damages against one or more defendants is discussed in the evaluative findings and conclusions of law in parts V and VI *infra*.

### III.

I find that Gerald Halloran, the shop steward for Local 25 at Bonanno, acting individually or with other pickets, committed the following acts of violence: During the first week of the strike he vandalized the fire alarm system at the plant; on August 7, 1975 he knowingly assisted another picket in causing a collision with a Bonanno truck; on September 2, 1975 together with Peter Forrest, he participated in an incident at Simmons College in which a delivery truck was stoned; on the evening of September 20, 1975 he attacked Paul Simpson, a private security guard on duty at the plant; in September, 1975 together with Peter Forrest, he threatened John McBride with physical injury and attempted to lock McBride in a trailer at the plant; in January, 1976 he threw a lighted cigarette into a Bonanno truck containing inflammable linens; one afternoon during the spring of 1976, together with Peter Forrest, Herbert Salter, and several other pickets, he participated in a rock-throwing incident at the plant; during the strike he frequently followed Bonanno trucks along delivery routes and participated in the threatening incidents involving Chivakos and Doherty (*see* part I *supra* at p. 235); and on different occasions beginning as early as June 23, 1975 he personally threatened McLaren, Chivakos, Robert Orcione, Henry Trabucco, William Mungarten, and Charles Bonanno.

I find that Peter Forrest, a shop steward for Local 25 at another Association member company, acting individually or with other pickets, committed the following acts of violence in addition to those as to which it is stated immediately above that he participated: On one occasion he sprayed paint on a Bonanno vehicle; in September, 1975 he pushed a security guard who was passing through the picket line on a motorcycle; and on different occasions beginning as early as July 9, 1975 he personally threatened McLaren, Thomas Wetherbee, Richard Smith and David Holsberg.

I find that through January 2, 1977, Gerald Halloran and Peter Forrest, by their acts and threats of violence, directly contributed to creating and prolonging Bonanno's need for plant protection and escort services. I also find that Gerald Halloran's actions during the incident on August 7, 1975 involving the collision with a Bonanno truck directly contributed to causing damage to the truck and the need for repair expenditures. Except for this specific incident of violence, however, I am unable to find that either Halloran or Forrest was personally involved in causing any of the other damage to property for which Bonanno incurred repair expenses, as identified in part II *supra* at p. 237. Similarly, I am unable to find that either defendant was personally involved in the attack on Richard Smith.

I am unable to find that defendants Arthur Moran, Jack Kerwin, John O'Malley, Ernest Zimmerman, Joseph Caico, or William McCarthy, acting individually or with other members of Local 25, committed any acts of violence against Bonanno or its employees.[8]

7. Although Plaintiff's Exhibit 10 does not contain checks issued in payment for two invoices totaling $6690.00 from the Medford Police Department, I find circumstantially from the evidence submitted that plaintiff did pay these invoices. Accordingly, without reaching the merits of the dispute as to whether such checks were in fact submitted originally as part of Plaintiff's Exhibit 10, I deny plaintiff's Motion to Substitute Evidence. I also find that all invoices for private security guards, for which plaintiff did not submit corresponding checks, were paid by Bonanno.

8. Pursuant to Fed.R.Civ.P. 65(a)(2), plaintiff offered in evidence testimony and affidavits presented during the hearings of August 12 and September 8, 1975 on the motion for a temporary restraining order. *See* Trial Transcript of October 30, 1981 at 6–69 to 6–78. At trial the

From circumstantial evidence, however, I find that all acts of violence against Bonanno that were committed by unidentified persons during the strike, including the attack on Richard Smith, were, in fact, committed by, or at the direction of, members of Local 25.

## IV.

Herbert Salter, the field representative for Local 25, had primary responsibility during the strike for organizing and supervising the picketing at Bonanno. Salter visited the site once a day on most days and often mingled with pickets near the gate to the plant. Salter was among the pickets on occasions when individuals were threatened (including the first day of the strike), when nails were strewn at the gate, and when trucks were followed, including the occasion on August 7, 1975 when a picket caused a collision with a Bonanno truck. Knowing that pickets sometimes engaged in acts of violence at delivery sites or along delivery routes, Salter nonetheless encouraged pickets to engage in ambulatory picketing during the strike. Also, in the spring of 1976, Salter personally participated in a rock-throwing incident at the plant. That day Charles Bonanno, who saw Salter with Halloran, Forrest, and other pickets strolling around the perimeter of the property at the time of the incident, confronted Salter about the violence, to which Salter replied, "Rocks are nothing compared to what you are gonna get."

I find that throughout the strike Salter knew about the recurring incidents of violence and threats of violence by members of Local 25, that Salter had the authority and the power to stop the violence, and that Salter intentionally failed to act. At no time did Salter remove a picket from the picket line or deprive a picket of strike benefits for having engaged in acts of violence. Rather, with knowledge that acts of violence were occurring, Salter allowed pickets to issue threats in his presence, endorsed the use of ambulatory picketing, and personally participated in at least one overt act of violence. Accordingly, I find that Salter, acting in his official capacity on behalf of Local 25, ratified or authorized all acts of violence by members of Local 25 during the strike.[9] I am unable to find that

court received the proffer but allowed counsel an opportunity to object by written submission "to any specific portions of that evidence." *Id.* at 6–78. In light of the post-trial submissions by counsel, I have excluded those portions of the proffer that contain statements or arguments of counsel. Also, for reasons explained at trial, I have received those portions of the proffer that relate to incidents of violence not involving Bonanno property or employees as bearing solely on the reasonableness of Bonanno's actions in attempting to protect its own property and employees. Other than those limited objections, which were raised either at trial or in post-trial submissions, defendants have identified no reason for excluding the otherwise relevant evidence offered in affidavit form or by live testimony at the hearings on the motion for a temporary restraining order. However, because most of the evidence in the proffer duplicates or parallels the testimony of witnesses at trial, I have found it unnecessary to rely on any portions of that evidence in making the findings of fact in parts I–IV of this opinion. Furthermore, in finding that defendant Joseph Caico committed no acts of violence against Bonanno employees or property, I have specifically rejected as insufficient proof of such acts of violence the affidavit testimony of Robert Orcione in light of his oral testimony at trial.

9. In finding ratification and authorization on the part of Herbert Salter I do not rely on the proffered hearsay testimony of Thomas Wetherbee, which was excluded at trial. *See* Trial Transcript of September 24, 1981 at 151–57. This testimony concerned statements by Eddie Patelli [Battelli], a member of Local 25 who is not named as a defendant in this action. *See id.* at 154. Initially, the court excluded the evidence as against both the individual defendants and Local 25. After a brief colloquy with counsel concerning the admissibility of the evidence under Fed.R.Evid. 801(d)(2)(d) as against defendants Local 25 and Herbert Salter (in his official capacity), the court adhered to its ruling to exclude the evidence, but added the following caveat:

I invite you both to be prepared to present cases to me if there are any on this subject and if after checking it further plaintiff's counsel wishes to move for reconsideration of the ruling I will hear you.

Trial Transcript of September 24, 1981 at 157. At no time during the trial, which did not conclude until October 30, 1981, did plaintiff move for reconsideration. Long after the close of evidence, however, in its Brief on Behalf of Plaintiff [Bonanno] at 20, plaintiff now moves to reconsider the ruling. In light of plaintiff's

Salter individually participated in any of the specific acts of violence for which Bonanno incurred repair expenses, as identified in part II *supra* at 237, or that Salter was personally involved in the attack on Richard Smith. I find, however, that between June 23, 1975 and January 2, 1977 Salter, both individually and as an official on behalf of Local 25, personally contributed to creating and prolonging Bonanno's need for plant protection and escort services.

## V.

Defendants contend that under state law there exists no claim upon which relief may be granted in this action, that if such a claim does exist plaintiff has failed to identify the claim adequately, and that in any event, this court lacks jurisdiction to adjudicate the claim.

Plaintiff commenced this action on August 7, 1975 in Suffolk Superior Court. The complaint, which was filed on that date, requests compensatory and injunctive relief, but does not identify by name or statute the precise legal claims upon which relief may be granted. On August 11, 1975 defendants removed to federal court on the theory that plaintiff was alleging an illegal secondary boycott as defined by 29 U.S.C. § 158(b)(4). In issuing a temporary restraining order on September 8, 1975, this court acknowledged its jurisdiction under 29 U.S.C. § 187 and also recognized the existence of pendent jurisdiction to adjudicate state law claims relating to defendants' unlawful use of violence. *See* Temporary Restraining Order of September 8, 1975 at ¶ 1. Some time after preliminary relief was granted, but before this action came on for trial, it became clear that a claim under 29 U.S.C. §§ 158(b)(4) and 187 could not be proved. Nonetheless, for reasons discussed in the court's Memorandum

and Order of September 30, 1980, this court retained jurisdiction to adjudicate the pendent state law claims.

### A.

The initial question to consider is whether plaintiff has stated a valid pendent state law claim against these defendants.

■ In their post-trial brief defendants argue, for the first time, that they have been prejudiced by plaintiff's failure to identify with greater specificity the state law claims upon which relief may be granted, and, therefore, that judgment should enter for defendants. Defendants' argument is without merit. The pleadings, the hearings on preliminary relief, and the subsequent proceedings in this court leading to trial adequately placed defendants on notice of the substance of plaintiff's claims. Plaintiff has alleged that during an otherwise lawful strike individual members of Local 25 committed tortious acts of violence against the property and employees of Bonanno, and that these tortious acts were authorized or ratified by Local 25. In substance, plaintiff has pleaded intentional and unprivileged infliction of economic harm by defendants during an otherwise privileged course of conduct. That plaintiff failed to identify these claims with greater specificity as common law claims for assault, battery, trespass, and intentional interference with advantageous business relations is unimportant. The substance of the claims is adequately identified in the pleadings, and defendants have had a full opportunity to use discovery procedures to clarify any ambiguities that may exist in the pleadings. In these circumstances, there is no reason to require plaintiff to use formal labels in identifying its state law claims.

■ Of course, this court will not create claims or theories of liability on behalf of

unexcused delay in moving for reconsideration, and in light of the unfairness that would result from having precluded defendants from presenting rebuttal evidence on this matter, I deny plaintiff's motion to reconsider. Moreover, because of the likelihood of unfair prejudice to defendants, who may have relied on the

court's evidentiary ruling concerning Wetherbee's oral testimony, I have specifically not relied on the similar testimony of Wetherbee by affidavit that was offered in evidence from the hearings on the motion for a temporary restraining order. *See* note 8 *supra*.

plaintiff. Plaintiff has neither pleaded nor argued that the individual defendants or defendant Local 25 participated in a conspiracy to harm Bonanno. As to the individual defendants, therefore, tort liability will be limited to the consequences of specific acts of violence committed by that individual acting either alone or with others as a joint tortfeasor. Similarly, defendant Local 25 will be held liable for the consequences of acts of violence committed by members of Local 25 only to the extent that such acts were authorized or ratified by Local 25.

■ I conclude that the pleadings, construed in this manner, state a valid cause of action for damages under Massachusetts common law against the individual defendants and defendant Local 25.[10] The courts of Massachusetts have long recognized the right of a business to recover damages for the harm caused by an unlawful strike. *See, e.g., Quinton's Market v. Patterson,* 303 Mass. 315, 21 N.E.2d 546 (1939). It follows that Massachusetts courts would also recognize an employer's right to recover damages for the harm caused by unlawful or violent conduct during a lawful strike. Permitting such an action for damages is consistent with general principles of tort law, and with the framework for state and federal regulation of labor disputes. It also accords with similar approaches taken in other jurisdictions. *See, e.g., Kayser-Roth Corp. v. Textile Workers Union of America,* 479 F.2d 524 (6th Cir.) (applying Tennessee law), *cert. denied,* 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 319 (1973).

### B.

■ Plaintiff failed to prove that Local 25 engaged in an illegal secondary boycott as defined by 29 U.S.C. § 158(b)(4). Plaintiff presented evidence of primary location picketing that affected third-party neutrals, and evidence of ambulatory picketing at the work-sites of third-party neutrals. The evidence, however, does not establish that Local 25 engaged in such activities for purposes prohibited by 29 U.S.C. § 158(b)(4).

### (1) *Pendent-claim Jurisdiction*

Defendant Local 25 contends that since plaintiff failed to establish its federal claim under 29 U.S.C. §§ 187 and 158(b)(4), this court lacks jurisdiction to decide the pendent state law claims described in part V–A *supra.*

■ First, I conclude that this court has the power to exercise jurisdiction over these pendent state law claims. The state and federal claims "derive from a common nucleus of operative fact," and "plaintiff's claims are such that [it] would ordinarily be expected to try them in one judicial proceeding." *United Mine Workers v. Gibbs,* 383 U.S. 715, 735, 86 S.Ct. 1130, 1143, 16 L.Ed.2d 218 (1966). Furthermore, the evidence presented at trial, although insufficient to establish a claim under 29 U.S.C. §§ 187 and 158(b)(4), confirmed the correctness of the court's previous determination that the federal claim was "substantial" when defendants removed the action to federal court.[11] *See* Memorandum and Order of September 8, 1975 at 4–5. It follows, therefore, that this court has power to exercise jurisdiction in this action, a conclusion that is implicit in the First Circuit's affirmance of Judge Tauro's temporary injunction.[12]

In addition, for the same reasons that this court denied defendant's motion to remand in September, 1980, I conclude that, as a matter of discretion, it is appropriate to

---

**10.** The Supreme Judicial Court of Massachusetts recently determined that a union may be named as a defendant in tort action for damages. *See Diluzio v. United Electrical, Radio, and Machine Workers of America, Local 274,* 386 Mass. 314, 435 N.E.2d 1027 (1982).

**11.** For the purposes of determining this court's *power* to exercise jurisdiction, "substantiality" must be determined as of the time of removal.

However, even if I were to evaluate the substantiality of the claim as of a later time—either at the commencement of the trial or at the close of evidence—I would still conclude, on the evidence presented in this case, that plaintiff's federal claim was neither frivolous nor obviously without merit.

**12.** *See* note 3 *supra.*

exercise that jurisdictional power and to decide the pendent state law claims raised in this action. *See id.* at 6.[13]

### (2) Pendent-party Jurisdiction

■ The individual defendants contend that even if this court does have jurisdiction to decide the pendent state law claims against Local 25, this court has no jurisdiction to adjudicate the state law claims against individual members of Local 25, since plaintiff's federal claim does not apply to these defendants. Defendants rely on *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978) and *Federal Deposit Insurance Corp. v. Otero,* 598 F.2d 627 (1st Cir.1979) as support for their argument that pendent-party jurisdiction may not be asserted in the circumstances of this case.

Relying originally on *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), defendants raised this same jurisdictional claim in a motion to dismiss, filed with the court on September 23, 1981, the day before trial commenced. On the morning of trial, following arguments by counsel, this court denied defendants' motion to dismiss. *See* Trial Transcript of September 24, 1981 at 3–12. For the same reasons offered then, I conclude now that it is appropriate to exercise pendent-party jurisdiction in this case. First, applying the guidelines of *United Mine Workers v. Gibbs,* 383 U.S. at 735, 86 S.Ct. at 1143–44, I conclude that this court has the power under Article

III of the Constitution to decide the claims against these individual defendants. *See Otero,* 598 F.2d at 631 ("As with *Aldinger, Kroger* instructs us to answer the preliminary question of potential Article III jurisdiction by applying the standard enunciated in [*Gibbs* ]"). Second, I conclude that there is no express or implied Congressional intent in the jurisdictional granting statute to "limit the sweep of potential Article III jurisdiction," *Otero,* 598 F.2d at 631. The jurisdictional granting statute, 29 U.S.C. § 187(b), is broadly worded to permit any plaintiff to bring an action in federal district court if that plaintiff has been injured in business or property by the conduct of a labor organization, and if the injurious conduct is an unfair labor practice under 29 U.S.C. § 158(b)(4). Nothing in the statute suggests that Congress intended otherwise to limit a federal district court's power to decide closely related claims by the same plaintiff against parties who are not labor organizations.[14] Finally, upon weighing numerous factors bearing on judicial economy, convenience, and fairness, I conclude that it is appropriate in the circumstances of this case to exercise jurisdiction. These factors, which were identified in full at trial (*see* Trial Transcript of September 24, 1981 at 10–12), weigh strongly in favor of exercising jurisdiction to decide the state law claims brought against these individual defendants.[15] Contrary to defendants' contention, I find nothing in either *Kroger* or *Otero* that requires a different result on the facts of this case.

---

**13.** As previously noted, *defendants* removed this action to federal court. Because I have concluded that it is appropriate in the exercise of discretion to decide the pendent state law claims in this action, I need not consider whether defendants should be barred under a theory of estoppel from raising at this late date an issue that, though often referred to as "jurisdictional," is one involving a discretionary determination in circumstances in which power to exercise jurisdiction is established.

**14.** 29 U.S.C. § 187 provides:
(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

(b) Whoever shall be injured in his business or property by reason [of] any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

**15.** As with the pendent-claim issue by defendant union, I need not decide whether the individual defendants, who together with Local 25 petitioned for removal to federal court, should be barred under a theory of estoppel from raising the pendent-party issue. *See* note 13 *supra.*

## VI.

■ I find that all of the expenses incurred by Bonanno between June 23, 1975 and January 2, 1977, part II *supra,* were reasonable. I find that the expenditures for plant protection and escort services were incurred to minimize property damage and personal injury to employees, that Bonanno (through its agents, Charles Bonanno, Kevin Finnerty, and Joseph Finnerty) had a reasonable belief that the expenditures between June 23, 1975 and January 2, 1977 were necessary to prevent acts of violence by members of Local 25, and that but for these expenditures Bonanno would have suffered substantial losses from other acts of violence by members of Local 25. Because I have found no acts or threats of violence after January 2, 1977, however, I am unable to find that the expenditures for plant security after January 2, 1977 were reasonably incurred to avoid damage from threatened violence. The last occasion when pickets were seen at the Bonanno plant site at night was in November, 1976. Threats of violence also last occurred in November, 1976. Plaintiff reasonably continued to incur expenses for special plant protection through the Christmas and New Year's holiday periods immediately following November, 1976, but I cannot find that expenses for special plant protection after January 2, 1977 were reasonably incurred to protect against threats of violence by any of the defendants in this case.

I find that between June 27, 1975 and August 22, 1975, during which time Bonanno used Medford Police Officers to guard the plant on weeknights and weekends, Bonanno benefited from the elimination of guard dog services in the amount of $1200.00 (eight weeks @ $150.00 per week). Expenses for the use of guard dogs on weeknights and weekends after August 23, 1975 are not recoverable in this action since Bonanno would have incurred these expenditures even if defendants had not engaged in acts of violence.

■ Based on the findings of fact stated in parts I–III *supra,* I conclude that Gerald Halloran is liable to Bonanno in the amount of $124,908.65, which amount represents all economic harm to Bonanno (less amounts saved) that was caused by Halloran's individual conduct. I conclude that Halloran's violent conduct, which commenced on June 23, 1975, was a legal cause of all expenses incurred by Bonanno in providing plant protection and escort services through January 2, 1977. In addition to the pre-1977 security services,[16] Halloran is liable for repair expenditures that resulted directly from his own conduct. Halloran's liability is calculated as follows:

| Plant Protection | |
|---|---|
| Medford Police | $34,628.00 |
| Guard Dogs, Inc., and Gallant's Security (8–18–75 to 1–2–77) | 45,899.12 |
| Less Benefit from Elimination of Yard Dogs (6–27–75 to 8–22–75) | (1,200.00) |
| Escort Services | |
| Guard Dogs, Inc. | 35,632.14 |
| Wackenhut Corp. and Investigators Services, Inc. | 6,886.16 |
| Assorted Private Security Services | |
| Guard Dogs, Inc. (6–23–75 to 6–27–75) | 2,038.00 [17] |
| Repair Expenses | |
| Truck Collision Repairs | 1,025.23 |
| TOTAL | $124,908.65 |

Based on the findings of fact stated in parts I–III *supra,* I conclude that Peter

---

16. Since Bonanno's expenditures for plant security after January 2, 1977 were not reasonably incurred to avoid harm from threatened violence, Halloran's conduct is not a legal cause of this economic harm.

17. The invoice of June 30, 1975 from Guard Dogs, Inc. does not distinguish clearly between the various security services provided during the first week of the strike. *See* note 6 *supra.* The invoice indicates that $1,375.50 is charged for "Escort hrs. @ $5.25," and that $812.50 is charged for "K–9 hrs. @ $6.50." I have re-

duced the total recoverable amount by $150.00, which is the amount that Bonanno would have paid for yard dog services even if the violence had not occurred during the strike. Accordingly, there is no need to determine the precise meaning of the categories of services represented by charges on the June 30, 1975 invoice. All expenditures for security services in excess of $150.00 during the period of June 23, 1975 and June 27, 1975 were caused by the acts of violence or threats of violence by defendants.

Forrest is liable to Bonanno in the amount of $116,525.42. This amount reflects all reasonable expenditures for plant security and escort services (less amounts saved) incurred by Bonanno between July 9, 1975 and January 2, 1977,[18] calculated as follows:

Plant Protection

| | |
|---|---|
| Medford Police (7–9–75 to 10–10–75; 12–12–75) | $29,008.00 |
| Guard Dogs, Inc., and Gallant's Security Service (8–18–75 to 1–2–77) | 45,899.12 |
| Less Benefit from Elimination of Yard Dogs (7–9–75 to 8–22–75) | (900.00) |

Escort Services

| | |
|---|---|
| Guard Dogs, Inc. | 35,632.14 |
| Wackenhut Corp. and Investigators Services, Inc. | 6,886.16 |
| TOTAL | $116,525.42 |

Since I am unable to find that defendants Moran, Kerwin, O'Malley, Zimmerman, Caico, or McCarthy committed any acts of violence against Bonanno or its employees, judgment will enter for these individual defendants.

■ I have determined from clear proof that Herbert Salter, in his official capacity as field representative for Local 25, authorized or ratified all acts of violence against Bonanno by members of Local 25. In addition, I have determined that all acts of violence against Bonanno, including those acts by unidentified individuals, were committed by, or at the direction of, members of Local 25. Based on these findings and other findings concerning the reasonableness of Bonanno's expenditures, I conclude that Local 25 (by the conduct of its authorized agent) is liable to Bonanno in the amount of $126,076.65. This amount reflects all reasonable expenditures (less amounts saved) incurred by Bonanno during the strike that were caused by authorized or ratified acts of violence by members of Local 25. The amount is calculated as follows:

18. I conclude that Forrest's violent conduct during this period of time was a legal cause of the expenditures for security services by Bonanno. Forrest may not be held liable for expenses incurred before July 9, 1975, which is the earliest date involving acts of violence by

Plant Protection

| | |
|---|---|
| Medford Police | $34,628.00 |
| Guard Dogs, Inc. and Gallant's Security Service (8–18–75 to 1–2–77) | 45,899.12 |
| Less Benefit from Elimination of Yard Dogs (6–27–75 to 8–22–75) | (1,200.00) |

Escort Services

| | |
|---|---|
| Guard Dogs, Inc. | 35,632.14 |
| Wackenhut Corp. and Investigators Services, Inc. | 6,886.16 |

Assorted Private Security Services

| | |
|---|---|
| Guard Dogs, Inc. (6–23–75 to 6–27–75) | 2,038.00 [19] |

Attack on Richard Smith

| | |
|---|---|
| All Expenses | 239.40 |

Repair of Bonanno Trucks

| | |
|---|---|
| All Expenses | 1,622.81 |

Repair of Plant Windows

| | |
|---|---|
| All Expenses | 331.02 |
| TOTAL | $126,076.65 |

I also conclude that Herbert Salter is individually liable in the amount of $123,883.42. This amount reflects all reasonable expenditures for plant security and escort services (less amounts saved) incurred by Bonanno between June 23, 1975 and January 2, 1977, calculated as follows:

Plant Protection

| | |
|---|---|
| Medford Police | $34,628.00 |
| Guard Dogs, Inc. and Gallant's Security Service (8–18–75 to 1–2–77) | 45,899.12 |
| Less Benefit from Elimination of Yard Dogs (6–27–75 to 8–22–75) | (1,200.00) |

Escort Services

| | |
|---|---|
| Guard Dogs, Inc. | 35,632.14 |
| Wackenhut Corp. and Investigators Services, Inc. | 6,886.16 |

Assorted Private Security Services

| | |
|---|---|
| Guard Dogs, Inc. (6–23–75 to 6–27–75) | 2,038.00 [20] |
| TOTAL | $123,883.42 |

I conclude that Salter, unlike the other individual defendants, had a personal duty during the strike to take reasonable steps to prevent acts and threats of violence by members of Local 25. This duty arose both

Forrest, or for expenditures incurred by Bonanno after January 2, 1977.

19. See note 17 supra.

20. See note 17 supra.

from his relationship to the parties and from his express assurances to this court on August 12, 1975 that he would control the pickets.[21] Having determined that Salter had both the power and the opportunity to control the pickets, I conclude that his deliberate failure to act constituted a personal breach of that duty. I conclude, therefore, that Salter's conduct (both his inaction and his actions during the rock-throwing incident in the spring of 1976) is a legal cause of all expenses incurred by Bonanno through January 2, 1977 in protecting employees and property from violence by members of Local 25. Salter's liability is based solely on this breach of duty and not on his ratification of acts of violence by others or on a theory of agent-subagent vicarious liability.

In concluding that Bonanno is entitled to recover its expenditures for private security guards through January 2, 1977, I reject defendants' two principal legal arguments. First, defendants argue that security guards sometimes carried firearms when escorting substitute drivers during the strike in violation of Mass.Gen.Laws Ann. ch. 147, § 30, and, therefore, that it would violate public policy to allow plaintiff to recover for expenditures associated with this "criminal conduct." Post-trial Memorandum of [Defendants] at 27. Second, defendants argue that as of April 23, 1976, at which time Local 25 and the Association signed a new collective bargaining agreement, Bonanno prolonged the picketing, and thereby prolonged the need for security guards by committing an unfair labor practice in failing to honor the new contract. *See* note 2 *supra.*

First, even assuming that the security guards were in violation of Massachusetts law in carrying firearms during this labor strike, I conclude that there is no relationship between the unlawful conduct of the security guards and the claims for damages by plaintiff in this action. The carrying of firearms by security guards neither caused defendants' tortious conduct, nor caused Bonanno to incur additional expenses during the strike. In this action for damages by Bonanno, no public policy would be served by excusing defendants from the consequences of their wrongful conduct because of the unrelated wrongful conduct of the security guards.[22] Similarly, I conclude that defendants did not become privileged to use violence against Bonanno by virtue of the unfair labor practice committed by plaintiff. As a matter of sound labor policy and as a principle of legal causation in tort law, the unfair labor practice cannot be viewed as an intervening event that relieves defendants of liability for the consequences of their intentional acts of violence. *See Kayser-Roth Corp.,* 479 F.2d at 528.

## VII.

For the reasons stated in this opinion, judgment will enter as follows:

(1) Judgment for defendants William McCarthy, Arthur Moran, Jack Kerwin, John O'Malley, Ernest Zimmerman, and Joseph Caico;

(2) Judgment for plaintiff against Local 25, Gerald Halloran, Herbert Salter, and Peter Forrest, jointly and severally, for security expenses in the amount of $116,525.42;

(3) Judgment for plaintiff against Local 25, Gerald Halloran, and Herbert Salter, jointly and severally, for security expenses in the amount of $7358.00, in addition to the amount stated in paragraph (2);

(4) Judgment for plaintiff against Local 25 and Gerald Halloran, jointly and severally, for repair expenses in the amount of $1025.23, in addition to the amounts stated in paragraphs (2) and (3);

---

**21.** *See* Excerpt of Transcript of August 12, 1975 at 3–5.

**22.** Defendants also argue that plaintiff violated the public policies of Mass.Gen.Laws Ann. ch. 149, § 23A in hiring armed guards during the labor dispute. I conclude that defendants have the burden of proving that plaintiff's conduct violates this statute and defendants failed to prove that the guards used by Bonanno were not "persons licensed under sections twenty-three to thirty, inclusive, of chapter one hundred and forty-seven or employees of such licensees." *Id.*

(5) Judgment for plaintiff against Local 25 for repair expenses and expenses arising from the attack on Richard Smith in the amount of $1168.00, in addition to the amounts stated in paragraphs (2), (3) and (4).

Plaintiff shall have interest and costs in accordance with applicable laws. Counsel will confer with the clerk forthwith and, if unable to agree on amounts due as interest and costs, will file written submissions within 14 days of entry of this opinion.

## SUPPLEMENTAL OPINION

Having determined that judgment should be entered for plaintiff in accordance with the Opinion filed June 30, 1982, the court directed that the parties confer with the clerk to determine whether agreement could be reached regarding pre-judgment interest. The parties have reported agreement as to the applicable rate of interest— eight per cent (8%)—but disagreement in other respects.

Plaintiff claims, on the entire sum awarded, interest at eight per cent (8%) per annum "from the date of commencement of the action" as provided by Mass.Gen.Laws ch. 231, § 6B, until the judgment is satisfied. Defendants challenge plaintiffs' claim to interest on two grounds.

## I.

First, acknowledging that interest should be awarded from the date of commencement of the action as to damages awarded for losses incurred before commencement of the action, defendants contend that ch. 231, § 6B does not apply to damages for losses accruing after commencement of the action and that as to damages for these losses the common law rule denying prejudgment interest should be applied. *See, e.g., D'Amico v. Cariglia,* 330 Mass. 246, 247, 112 N.E.2d 807, 808 (1953).

Defendants argue that there is no indication that the legislature considered the issue raised by losses accruing after commencement of a tort action, that they have found no Massachusetts court decision addressing this issue, that literal application of the statute in this context would provide plaintiff with a windfall, and that in these circumstances this court should allow no interest on damages for losses accruing after commencement of this action.

I conclude, however, that even if the Supreme Judicial Court of Massachusetts were to determine, as defendants contend, that the legislature did not address the issue presented here, it would decide this issue in the way it found most compatible with ch. 231, § 6B rather than applying to this issue the common law rule that the statute abrogated. The Supreme Judicial Court has declared that when the text of a statute does not answer a question, the court nevertheless takes into account the sense of the legislation as a whole in fashioning a rule on the question that the text of the statute leaves unanswered. *Mailhot v. Travelers Insurance Co.,* 375 Mass. 342, 348, 377 N.E.2d 681, 684 (1978). Legislative establishment of policy carries significance beyond the scope of the specific mandates of statutes. *Gaudette v. Webb,* 362 Mass. 60, 70, 284 N.E.2d 222, 229 (1972).

It seems most likely that the Supreme Judicial Court would conclude that pre-judgment interest should be awarded on the entire judgment, from the date of commencement of the action to the date of entry of the judgment. One may view the legislature's choice of the date of commencement of the action as a reasonable accommodation of competing interests. On the one hand, it fails to redress loss fully because it does not provide interest or any alternative form of compensation for delay in payment between the date earlier losses were incurred and the date of commencement of the action. On the other hand, it causes interest to be calculated from a date preceding losses accruing after the action is commenced. Thus, a "shortfall" in one respect is counterbalanced by a "windfall" in another respect. The legislature is free, of course, to provide for such an accommodation, and especially so when, as in the calculation of pre-judgment interest, there is value in having a fixed rule for mathematical-

ly calculable interest to avoid the costs and delays incident to disputes over details such as might be presented here if interest were awarded separately on many elements of damages from many different dates of accrual. Moreover, bearing in mind the reasonableness of such a legislative accommodation, one may be skeptical of the assertion that the legislature did not consider this issue. It is unlikely indeed that, in providing for pre-judgment interest on tort awards, the legislature would have failed to consider the fact that many tort judgments make lump-sum awards based on present value of losses to accrue not merely after commencement of the action but even after entry of the judgment. Especially in light of the statutory directive that the clerk add interest—a directive from which one may infer that the statutory rule of entitlement was meant to be fixed and calculable without any need for factfinding regarding dates of accrual of separate elements of damages—it is more reasonable to read the legislative prescription as one applying to all tort damages, whether for losses accruing before or for losses accruing after the date of commencement of the action. This conclusion is supported as well by analogy to the issue decided in *Carey v. General Motors Corp.*, 377 Mass. 736, 387 N.E.2d 583 (1979). The jury verdict in that case included an amount for future loss of earning capacity.[1] The Supreme Judicial Court de-

clared: "The interest was thereafter correctly calculated on the entire verdict as unequivocally required by the statute, G.L.C. 231, § 6B." 377 Mass. at 745, 387 N.E.2d at 589. I am guided by the opinion in *Carey* as the most recent expression of the Supreme Judicial Court bearing on this issue.[2]

I conclude that applicable Massachusetts law requires that interest on the entire judgment be awarded from the date of commencement of the action.

## II.

■ Defendants contend, secondly, that pre-judgment interest should not be awarded beyond January, 1979—at which time a notice of potential dismissal for want of prosecution was issued by the clerk under the direction of the court. Defendants appear to make an alternative argument that interest should be denied for the period January, 1980, to April, 1980, during which a conference on the case was postponed because of unavailability of plaintiff's counsel. These contentions must be denied for two independent reasons. First, the law of Massachusetts, which governs the claim for pre-judgment interest, contains no such qualification or condition as defendants advance here. The statute, as *Carey* observes in another context, "unequivocally" provides for interest from commencement of

1. Referring to the issue in *Carey* as one analogous to the issue here may even be understating the force of *Carey* as precedent here. Since the verdict in *Carey* was said explicitly to have included damages for future loss of earning capacity, it is most likely that it included damages for loss of earnings after commencement of the action and before judgment. Thus it is likely that the issue presented here was also present in *Carey*, even though not explicitly discussed.

2. *Jet Spray Cooler, Inc. v. Crampton,* 377 Mass. 159, 182 n. 21, 385 N.E.2d 1349, 1362 n. 21 (1979) would seem to suggest a different interpretation of ch. 231, § 6B. "These statutes [ch. 231, §§ 6B and 6C] were not intended to award interest on damages accruing after the filing of this action, assuming that such interest is not actually an element of the damage itself." This observation was made, however, as a footnote to a reference to the separate statutory man-

date, Mass.Gen.Laws c. 235, § 8, regarding interest on an award based on the report of a master. The issue before the court in *Jet Spray* was thus controlled by a separate statute that is inapplicable to the issue now under consideration. *Jet Spray* is also distinguishable from the present case in that the monetary award in question there was based on defendant's net profits rather than plaintiff's loss. The court, in text immediately following footnote 21, adverted to "considerations of relative hardship" and to the fact that in an award to a plaintiff based on a defendant's profits "the plaintiff may actually recover far more than its actual loss." 377 Mass. at 182, 385 N.E.2d at 1363. There is no reason to think in the present case that the damage award exceeds plaintiff's loss, or that a calculation of interest accruing from the time the action was commenced and an addition of that interest to the damages will produce a sum exceeding the plaintiff's loss.

the action to the date of judgment. 377 Mass. at 746, 387 N.E.2d at 589. Second, I find no factual basis for imposing a sanction against the plaintiff because of any delay between commencement of this action and disposition. Close examination of the history of this case reveals delays for a variety of reasons, among which were the heavy caseload of the court and the pendency of another controversy between the parties, which was thought possibly to have a bearing on this case and which was finally resolved by the Supreme Court of the United States after trial of this case was commenced. I find that plaintiff has not delayed the final disposition of this case.

### III.

Plaintiff claims that interest at the rate of eight per cent (8%) per annum should continue to accrue until the judgment is actually satisfied. Although plaintiff is apparently relying on ch. 231, § 6B for its claim of interest at the specified rate accruing beyond the date on which judgment was entered, ch. 231, § 6B applies only to that period from the date of commencement to the date on which judgment is entered.[3] Once the clerk of court adds interest to the amount of the judgment, this full sum itself then bears interest as specified by 28 U.S.C. § 1961 and Mass.Gen.Laws ch. 235, § 8, *see Boston Edison Company v. Tritsch,* 370 Mass. 260, 263, 346 N.E.2d 901, 903 (1976). This latter interest is, of course, not prejudgment interest—the subject that the parties were asked to address—but is properly characterized as interest on the judgment. In entering judgment, the clerk need not make any calculation of interest on the judgment.

For the foregoing reasons, it is ORDERED:

Plaintiff shall recover pre-judgment interest on the entire judgment at eight per cent (8%) per annum from the date of commencement of the action to the date of

entry of judgment. The clerk shall enter final judgment forthwith.

---

**3.** Chapter 231, § 6B directs the clerk of court to add interest to the amount of damages specified in the verdict, finding or judgment, with interest calculated from the date of the commencement of the action. It contains no instruction to the court to impose interest for any period after the judgment, finding or verdict is entered.